IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 11, 2017 Session

**ROSE COLEMAN v. BRYAN OLSON**

**Appeal by Permission from the Court of Appeals
Circuit Court for Montgomery County
No. MCCCCVDN130157    Ross H. Hicks, Judge**

—————————————————————

**No. M2015-00823-SC-R11-CV**

—————————————————————

When a divorce complaint is filed and served, a statutory injunction goes into effect prohibiting both parties from changing the beneficiary on any life insurance policy that names either party as the beneficiary without the consent of the other party or a court order. *See* Tenn. Code Ann. § 36-4-106(d)(2) (2010). Jessica Olson sued her husband, Bryan Olson, for divorce. A week later, Ms. Olson, while seriously ill, changed the beneficiary on her life insurance policy from her husband to her mother. Ms. Olson died a few days later. Her mother, Rose Coleman, collected the life insurance benefits. Ms. Coleman sued Mr. Olson for grandparent visitation under Tennessee Code Annotated section 36-6-306 (2010). Mr. Olson responded that he did not oppose visitation, and therefore, Ms. Coleman was not entitled to court-ordered visitation. In addition, Mr. Olson countersued to recover the life insurance benefits. The trial court awarded the insurance benefits to the Olsons' child, finding that Ms. Olson had intended to remove Mr. Olson and substitute their child as the insurance beneficiary. The trial court ordered Ms. Coleman to pay the remaining life insurance funds into the court registry, to account for her expenditures, and to pay a judgment for expenditures that did not benefit the child. The trial court also granted Ms. Coleman's petition for grandparent visitation. The Court of Appeals reversed, awarding the life insurance benefits to Mr. Olson based on Ms. Olson's violation of the statutory injunction and its consideration of Mr. Olson's financial needs. In addition, the Court of Appeals reversed the trial court's award of visitation to Ms. Coleman. We hold that (1) Ms. Olson violated the statutory injunction under Tennessee Code Annotated section 36-4-106(d)(2) when she removed Mr. Olson as her life insurance beneficiary; (2) the Olsons' divorce action abated when Ms. Olson died and the statutory injunction became ineffective; (3) a trial court, after the abatement of a divorce action, may remedy a violation of the statutory injunction after considering the equities of the parties; (4) the trial court erred by awarding the life insurance benefits to the Olsons' child based on the pleadings and the evidence; (5) the Court of Appeals erred by awarding the life insurance benefits to Mr. Olson without sufficient evidence of the equities of the parties; (6) the trial court, on remand, may remedy the violation of the

1

statutory injunction by awarding all or a portion of the life insurance benefits to either or both parties after hearing additional evidence and considering the equities of the parties; and (7) Ms. Coleman was not entitled to court-ordered grandparent visitation absent Mr. Olson's opposition to visitation. We affirm in part and reverse in part the judgment of the Court of Appeals; we reverse and vacate the judgment of the trial court and remand to the trial court for further proceedings.

**Tenn. R. App. P. 11, Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part; Judgment of the Trial Court Reversed and Vacated; Remanded to the Trial Court**

SHARON G. LEE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Christopher J. Pittman and Zachary L. Talbot, Clarksville, Tennessee, for the appellant, Rose Coleman.

Travis N. Meeks, Clarksville, Tennessee, for the appellee, Bryan Olson.

Erin S. Poland, Clarksville, Tennessee, Amicus Curiae and Guardian Ad Litem for the Minor Child.

**OPINION**

**I.**

In 2007, Jessica and Bryan Olson were married and the next year they had a child. On July 5, 2012, Ms. Olson sued for divorce in the Montgomery County Chancery Court. When Ms. Olson filed and served the complaint, a statutory injunction went into effect prohibiting both parties from changing the beneficiary on any life insurance policy that named either party as beneficiary without the other's consent or a court order. *See* Tenn. Code Ann. § 36-4-106(d)(2).[1]

---

[1] Tennessee Code Annotated section 36-4-106(d)(2) provides in part:

(d) Upon the filing of a petition for divorce or legal separation, and upon personal service of the complaint and summons on the respondent . . . , the following temporary injunctions shall be in effect against both parties . . . :

(2) An injunction restraining and enjoining both parties from voluntarily canceling, modifying, terminating, assigning, or allowing to lapse for nonpayment of premiums, any insurance policy, including, but not limited to, life, . . . where such insurance policy . . . names either of the parties or the children as beneficiaries without the consent of the

2

Four days after filing for divorce, Ms. Olson became ill and was treated in the emergency room of a local hospital. The next day, Ms. Olson returned to the emergency room and then went to Vanderbilt University Medical Center where she was diagnosed with Stevens-Johnson syndrome, a serious and painful skin condition.

Two days later, on July 12, 2012, Ms. Olson signed a document that changed the beneficiary of her life insurance policy from Mr. Olson to Ms. Coleman and named the Olsons' minor child as the contingent beneficiary. Two of Ms. Olson's friends, Jenny Mims and Jessica Steventon, were in Ms. Olson's hospital room when she signed the document. Ms. Mims notarized Ms. Olson's signature and sent the document to Ms. Olson's employer. One week later, on July 19, 2012, Ms. Olson died. As the beneficiary of the life insurance policy, Ms. Coleman collected nearly $400,000.

Less than a week after her daughter's death, Ms. Coleman filed a petition in the Montgomery County Juvenile Court against Mr. Olson, alleging that her grandchild was dependent and neglected. She sought either custody or grandparent visitation under Tennessee Code Annotated section 36-6-306. The next month, the juvenile court granted Ms. Coleman four weeks of visitation. Later, the juvenile court granted Ms. Coleman four more weeks of visitation. In late January 2013, Mr. Olson filed a petition in the Montgomery County Circuit Court challenging the juvenile court's jurisdiction to award grandparent visitation under Tennessee Code Annotated section 36-6-306 and the juvenile court's decision to grant visitation without hearing evidence. The circuit court denied the petition. On February 12, 2013, the juvenile court dismissed Ms. Coleman's case without prejudice, based on her notice of voluntary nonsuit.

On February 12, 2013, the same day the juvenile court dismissed her case, Ms. Coleman filed a petition in the Montgomery County Circuit Court for grandparent visitation under Tennessee Code Annotated section 36-6-306. Ms. Coleman alleged that based on her significant relationship with her grandchild and Ms. Olson's death, the Olsons' child would be substantially harmed if his relationship with Ms. Coleman ended. Mr. Olson answered, stating that he did not oppose Ms. Coleman's visitation, and therefore, she was not entitled to court-ordered visitation under Tennessee Code Annotated section 36-6-306. Mr. Olson countersued Ms. Coleman for the life insurance benefits, alleging fraud, forgery, conversion, and undue influence.[2] Mr. Olson argued in

---

other party or an order of the court. "Modifying" includes any change in beneficiary status.

Tenn. Code Ann. § 36-4-106 (2010).

[2] Mr. Olson amended his counter-petition to sue Ms. Mims, alleging collusion between her and Ms. Coleman resulting in the change in Ms. Olson's life insurance beneficiary. Mr. Olson later voluntarily dismissed Ms. Mims from the case.

his pretrial brief that Ms. Olson secretly changed the beneficiary on her life insurance policy in violation of the statutory injunction.

On November 14 and December 5, 2014, the trial court heard evidence presented by Ms. Coleman and Mr. Olson.[3] Ms. Coleman, who lived in Massachusetts, testified that she and her daughter and grandchild had a good relationship, visited often, and talked almost daily. In late June 2012, Ms. Coleman traveled to Tennessee because of problems between her daughter and Mr. Olson. During that time, Ms. Olson discussed filing for a divorce and changing the beneficiary of her life insurance policy.

In July 2012, Ms. Coleman returned to Tennessee when Ms. Olson became ill. On July 12, 2012, while Ms. Olson was hospitalized, Ms. Coleman, at her daughter's request, prepared a handwritten change of beneficiary document that removed Mr. Olson as the beneficiary and named Ms. Coleman as the primary beneficiary and the Olsons' child as the contingent beneficiary. Ms. Coleman testified that she did not know about the statutory injunction, but understood that Ms. Olson wanted Ms. Coleman to be the administrator of the insurance funds for the benefit of the child. According to Ms. Coleman, Ms. Olson read and signed the change of beneficiary document in the presence of Ms. Coleman, Ms. Mims, and Ms. Steventon. Ms. Coleman explained that when Ms. Olson signed the document, she was intubated, responsive, awake, and able to see. Ms. Olson communicated by writing, pointing, and texting, and she had no questions about what she was signing. Ms. Coleman denied signing Ms. Olson's name on the document or that she or anyone else pressured Ms. Olson to change her insurance beneficiary. Ms. Coleman also denied that she agreed with Ms. Mims and Ms. Steventon to lie about Ms. Olson's signature.

Ms. Mims testified that Ms. Olson and her child came to live with her and her husband on July 8, 2012. Two days later, Ms. Mims took Ms. Olson to a local emergency room and then went with her to Vanderbilt University Medical Center. According to Ms. Mims, Ms. Olson could communicate, speak, answer questions, and understand what was going on. Ms. Mims visited Ms. Olson at the hospital almost every day, and when they exchanged text messages, Ms. Olson's responses were appropriate. Ms. Mims understood that Ms. Olson wanted to change her life insurance beneficiary for the benefit of her child. On July 12, 2012, Ms. Mims received information from Ms. Olson's employer about how Ms. Olson could change her life insurance beneficiary. Ms. Mims and Ms. Steventon were in Ms. Olson's hospital room when Ms. Coleman handwrote the change of beneficiary document, and they watched Ms. Olson sign the document. Ms. Mims testified that Ms. Olson made Ms. Coleman the beneficiary because Ms. Olson was concerned that if she named her child as beneficiary, Mr. Olson would receive the funds. Ms. Olson was conscious and her eyes were open when she signed the document. Ms. Mims believed that Ms. Olson signed the change of beneficiary document of her own free

---

[3] The child's court-appointed guardian ad litem participated, but called no witnesses.

will. Ms. Mims denied that she conspired with Ms. Coleman or that she pressured Ms. Olson to sign the document. Ms. Mims notarized the signed document and faxed it to Ms. Olson's employer.

Ms. Steventon testified by deposition that she went with Ms. Mims to Vanderbilt University Medical Center to visit Ms. Olson and to witness her signing the change of beneficiary document. Ms. Steventon, Ms. Mims, and Ms. Coleman discussed the information that should be included in the document. Ms. Steventon saw Ms. Coleman handwrite the document, and she saw Ms. Olson sign it. Ms. Olson communicated with them by writing and nodding her head. Ms. Steventon saw no one threaten Ms. Olson, and she saw no one pressure or direct Ms. Olson to sign the document. She believed that Ms. Olson knew what she was doing and that she voluntarily signed the document.

Janelle Kascht, the regional manager for Ms. Olson's employer and her supervisor, testified by deposition that in the month before Ms. Olson's death, Ms. Olson told her she was divorcing her husband and needed to get her financial matters in order. The day Ms. Olson went into the hospital, Ms. Kascht called Ms. Olson and explained how to change the beneficiary of her life insurance policy. Ms. Kascht testified that Ms. Olson's responses were appropriate, and she had no concerns about Ms. Olson's ability to understand what was happening.

Marcus Johnson, Ms. Olson's friend and coworker, testified that Ms. Olson, before going to the hospital, was upset and talked to him about finding a new apartment, refinancing loans, changing her 401(k), and removing Mr. Olson's name from "everything." On July 9, 2012, Ms. Olson told Mr. Johnson that she was sick and would not be at work. On July 12, 2012, Mr. Johnson gave Ms. Kascht the change of beneficiary paperwork that Ms. Mims had faxed to him. Mr. Johnson was familiar with Ms. Coleman because she had visited Ms. Olson at work. He had no reason to believe that Ms. Coleman threatened or pressured Ms. Olson into signing the change of beneficiary document.

Dr. Todd W. Rice, a pulmonary and critical care physician at Vanderbilt University Medical Center, testified by deposition that he treated Ms. Olson and diagnosed her with Stevens-Johnson syndrome. According to his notes from July 12, 2012, Dr. Rice saw Ms. Olson in the intensive care unit during morning rounds and four or five times throughout the day. Her face was red and swollen, she could open her eyes some, and she had sloughing or peeling of the top layer of the eye. Ms. Olson was medicated and intubated, but awake and responsive.

Mr. Olson testified that he tried to visit and call Ms. Olson in the hospital but could not see or speak with her. Mr. Olson also attempted to contact Ms. Coleman, but she did not respond. Mr. Olson did not know that Ms. Olson had changed her life insurance beneficiary until after he opened her estate. He believed that someone had

forged Ms. Olson's signature on the change of beneficiary document. Mr. Olson testified that after Ms. Olson's death, he had marital assets worth $15,000 and marital debts totaling $230,000.

Both parties called handwriting experts to testify about Ms. Olson's signature on the change of beneficiary document. Ms. Coleman's expert, Thomas Vastrick, a forensic document examiner certified by the American Board of Forensic Document Examiners, testified that it was highly probable that the person who signed the change of beneficiary document was the same person who wrote Ms. Olson's known signatures. Mr. Olson's expert witness, Marty Pearce, a forensic document examiner certified by the Institute of Graphological Science, testified that the signature on the change of beneficiary document was not Ms. Olson's genuine signature.

Ms. Coleman testified that she received $393,000 in life insurance benefits. From these funds, she established a $50,000 college fund and bought items for her grandchild. Ms. Coleman also paid Ms. Olson's funeral expenses, travel expenses for herself and her grandchild, and attorney's fees, leaving a balance of $292,488 in life insurance proceeds. She denied spending the money on herself.

As to grandparent visitation, Ms. Coleman explained that she believed ending her relationship with her grandchild would harm the child and that court intervention was necessary for her to continue the relationship. Ms. Coleman stated that her relationship with the child had strengthened after she spent more time with the child under the juvenile court's order of visitation. Although Mr. Olson allowed Ms. Coleman to have visitation after she dismissed her juvenile court petition, Ms. Coleman testified that she and Mr. Olson did not care for each other and that their communications were unpleasant. Ms. Coleman said that Mr. Olson gave her a "hard time" about visitation, denied her visitation, restricted her visitation, and sometimes did not allow her to talk with the child on the phone. Ms. Coleman admitted that Mr. Olson had restricted her visitation after she did not tell him about her plans to take the child to Disney World. Ms. Coleman attributed the hostility between her and Mr. Olson to their contentious litigation and the marital problems between her daughter and Mr. Olson.

Mr. Olson confirmed the mutual animosity between the parties and explained that Ms. Coleman had never liked him or approved of his marriage to Ms. Olson. He agreed that his child had a significant relationship with Ms. Coleman and that it was in the child's best interest to continue to visit with her. Mr. Olson stated that he had not opposed visitation and had tried to facilitate a relationship between Ms. Coleman and the child. Ms. Coleman, however, had insisted on scheduling visitation through their attorneys and the court system and failed to communicate her desired visitation dates. Mr. Olson testified that he would ensure that Ms. Coleman continued to have a significant relationship with the child without court intervention.

In February 2015, the trial court denied Mr. Olson's counterclaim for the life insurance benefits and granted Ms. Coleman's petition for grandparent visitation. The trial court awarded the life insurance benefits to the Olsons' child, finding that Ms. Olson had changed her life insurance beneficiary because of "unintentional or accidental undue influence." In reaching this decision, the trial court first found that Ms. Olson had signed the change of beneficiary document; although she was suffering from a serious illness, Ms. Olson's mental capacity "was not diminished to the point that she was unable to make decisions." The trial court concluded that Ms. Olson had intended to change her beneficiary from Mr. Olson to her child to ensure that her child benefitted from the insurance proceeds and determined that whether Ms. Olson's action was "intentional or not, the change of beneficiary form did not accomplish what Ms. Olson intended" because she "inadvertently" made Ms. Coleman the beneficiary. The trial court found no evidence of fraud or forgery.

The trial court also found that the purpose of the statutory injunction in Tennessee Code Annotated section 36-4-106(d)(2) was to maintain the status quo until the trial court finalized the divorce. As a result, the child's interests were "equitably vested in the enforcement of the Order despite the change of beneficiary to Ms. Coleman." The trial court concluded that Ms. Olson had violated the conditions of the injunction, but her conduct was not "contemptuous" or an intentional defiance of a court order.

Based on these findings, the trial court invoked its "inherent equity power to right a wrong and do what is in the best interests of the minor child" and awarded the life insurance benefits to the Olsons' child. The trial court also ordered Ms. Coleman to deposit the remaining funds into the court registry for the use and benefit of the child. The trial court found that Ms. Olson's funeral expenses, necessities for the child, and the child's $50,000 college fund were appropriate expenditures but that Ms. Coleman's expenditures for travel and litigation fees and expenses were not appropriate. The trial court ordered Ms. Coleman to account for her expenditures.

As to grandparent visitation, the trial court awarded Ms. Coleman visitation based on Ms. Coleman's close relationship with her grandchild and Ms. Olson's death, which created a rebuttable presumption that substantial harm to the child would result from the cessation of the relationship. The trial court noted that Mr. Olson had allowed and even sometimes suggested visitation, but doubted that Mr. Olson would allow future visitation except on his terms. The trial court found that the circumstances and animosity between the parties would make it difficult if not impossible for the parties to coordinate reasonable visitation without a court order.

In April 2015, the trial court heard the parties' post-trial motions and testimony about Ms. Coleman's expenditures. Ms. Coleman filed an accounting of her expenditures

7

and deposited $223,093.47 with the court registry.[4] The trial court entered an order finding that Ms. Coleman had received $395,525.15 in life insurance proceeds and accrued interest. The trial court found that some of Ms. Coleman's expenditures from the insurance benefits were inappropriate, including reimbursements to herself for expenses incurred before Ms. Olson's death, Ms. Coleman's legal fees in the juvenile court case, and travel expenses for visitation under the juvenile court order. The trial court entered a judgment against Ms. Coleman for $86,880 and ordered her to pay into the court registry the remaining funds in her savings account for credit toward the judgment. The trial court also awarded $37,140 in attorney and guardian ad litem fees and expenses from the insurance proceeds.

*Court of Appeals' Ruling*

Mr. Olson appealed to the Court of Appeals and raised two issues. First, he argued that Ms. Olson had violated the injunction imposed by Tennessee Code Annotated section 36-4-106(d)(2), and therefore, the trial court erred by awarding the life insurance benefits to his child and not restoring the status quo by awarding him the benefits. Second, Mr. Olson argued that the trial court erred by awarding Ms. Coleman grandparent visitation under Tennessee Code Annotated section 36-6-306(a).

Ms. Coleman raised several issues. First, she argued that the trial court erred by awarding the life insurance proceeds to the Olsons' child, who was not a party to the action. Second, Ms. Coleman insisted that the trial court erred by finding that some of her expenditures from the life insurance proceeds did not benefit the child and by ordering her to make reimbursement. Third, she argued that the trial court erred by ordering the seizure of her savings account to satisfy the order for reimbursement. Finally, Ms. Coleman submitted that the trial court properly awarded her grandparent visitation.

The Court of Appeals focused on the appropriate remedy for a party in a divorce case who was deprived of certain property after the other party violated the statutory injunction. *Coleman v. Olson*, No. M2015-00823-COA-R3-CV, 2016 WL 6135395, at *14 (Tenn. Ct. App. Oct. 20, 2016). The Court of Appeals adopted the reasoning of the Vermont Supreme Court's decision in *Aither v. Estate of Aither*, 913 A.2d 376 (Vt. 2006), which held that the trial court could remedy the violation of an injunction after the abatement of a divorce action by considering the equities of the parties. The Court of Appeals awarded Mr. Olson the life insurance benefits after considering Mr. Olson's financial situation following his wife's death and remanded the case to the trial court for futher proceedings. In addition, the Court of Appeals reversed the award of visitation to Ms. Coleman because she failed to prove that Mr. Olson had opposed visitation between

---

[4] This amount included $7,500 in refunded legal fees from Ms. Coleman's former attorney, Carrie W. Gasaway, who withdrew from the case.

Ms. Olson's death in July 2012 and the filing of Ms. Coleman's petition for grandparent visitation in February 2013.

II.

We granted Ms. Coleman's Tennessee Rule of Appellate Procedure 11 application for permission to appeal and review the decisions of the trial court and the Court of Appeals regarding the distribution of the life insurance proceeds and grandparent visitation.

The issues in this appeal involve similar standards of review. Issues of statutory construction present questions of law that we review de novo with no presumption of correctness. *Martin v. Powers*, 505 S.W.3d 512, 518 (Tenn. 2016). The primary goal of statutory interpretation is to carry out legislative intent without expanding or restricting the intended scope of the statute. *State v. Smith*, 484 S.W.3d 393, 403 (Tenn. 2016) (citations omitted). In determining legislative intent, we first must look to the text of the statute and give the words of the statute "their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012) (citations omitted). When a statute's language is clear and unambiguous, we enforce the statute as written; we need not consider other sources of information. *Frazier v. State*, 495 S.W.3d 246, 249 (Tenn. 2016). We apply the plain meaning of a statute's words in normal and accepted usage without a forced interpretation. *Baker v. State*, 417 S.W.3d 428, 433 (Tenn. 2013). We do not alter or amend statutes or substitute our policy judgment for that of the Legislature. *Armbrister v. Armbrister*, 414 S.W.3d 685, 704 (Tenn. 2013).

We review the trial court's findings of fact de novo upon the record with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We defer to the trial court's determinations of witness credibility because the trial judge could observe the witnesses' demeanor and hear in-court testimony. *King v. Anderson Cnty.*, 419 S.W.3d 232, 245–46 (Tenn. 2013).

*Life Insurance Proceeds*

First, we review the decisions of the trial court and the Court of Appeals on who should receive Ms. Olson's life insurance benefits: Ms. Coleman, as the named beneficiary; Mr. Olson, as the Court of Appeals determined; or the Olsons' child, as the trial court determined. The differing approaches used by the trial court, the Court of Appeals, and courts in other jurisdictions reflect the difficulty of this issue.

We begin by considering the trial court's decision to award the life insurance funds to the Olsons' child, to require Ms. Coleman to repay the remaining life insurance proceeds, and to account for her expenditures. The basis for the trial court's decision was

9

its finding that there had been "unintentional or accidental undue influence" and that Ms. Olson "inadvertently" made Ms. Coleman the life insurance beneficiary. No doubt, the trial court made a sincere effort to solve a difficult problem and to reach a fair decision. But neither party asked the trial court to award the insurance benefits to the child. Nor did Mr. Olson ask the trial court to establish a constructive trust as a remedy for Ms. Olson's violation of the statutory injunction.

In addition, the trial court's reliance on "accidental undue influence" was an inadequate ground to create, in effect, a constructive trust for the child and to order Ms. Coleman to relinquish the life insurance proceeds. The trial court did not find that Ms. Coleman had engaged in intentional wrongdoing, fraud, forgery, or other misconduct that resulted in Ms. Olson changing her life insurance beneficiary. A trial court can impose a constructive trust

> against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Cent. Bus Lines, Inc. v. Hamilton Nat'l Bank*, 239 S.W.2d 583, 585 (Tenn. Ct. App. 1951). Courts have imposed constructive trusts in four types of cases:

> (1) where a person procures the legal title to property in violation of some duty, express or implied, to the true owner; (2) where the title to property is obtained by fraud, duress or other inequitable means; (3) where a person makes use of some relation of influence or confidence to obtain the legal title upon more advantageous terms than could otherwise have been obtained; and (4) where a person acquires property with notice that another is entitled to its benefits.

*Roach v. Renfro,* 989 S.W.2d 335, 341 (quoting *Intersparex Leddin KG v. Al-Haddad*, 852 S.W.2d 245, 249 (Tenn. Ct. App. 1992)) (internal citation omitted).

Given the lack of evidence to support the establishment of a constructive trust and that neither party requested the trial court to award the life insurance proceeds to the Olsons' child, the trial court erred in creating what amounted to a constructive trust on behalf of the child. It follows then that the trial court erred in ordering Ms. Coleman to pay the remaining funds from the life insurance policy into the court registry, to make an accounting, and to pay a judgment for some of her expenditures.

Next, we turn to the Court of Appeals' decision to award Mr. Olson the life insurance benefits based on Ms. Olson's violation of the statutory injunction under Tennessee Code Annotated section 36-4-106(d)(2).

Tennessee Code Annotated section 36-4-106(d) provides that when a petition for divorce or legal separation is filed and served, the following temporary injunction is in effect against both parties:

> (2) An injunction restraining and enjoining both parties from voluntarily canceling, modifying, terminating, assigning, or allowing to lapse for nonpayment of premiums, any insurance policy, including, but not limited to, life . . . where such insurance policy provides coverage to either of the parties or the children, or that names either of the parties or the children as beneficiaries without the consent of the other party or an order of the court. "Modifying" includes any change in beneficiary status.

Tenn. Code Ann. § 36-4-106(d)(2). The statute further provides that the temporary injunction "shall be in effect against both parties until the final decree of divorce or order of legal separation is entered, the petition is dismissed, the parties reach agreement, or until the court modifies or dissolves the injunction." *Id.* § 36-4-106(d).

The statutory injunction went into effect when Ms. Olson filed and served the divorce complaint. A week later, while in the hospital, Ms. Olson changed her life insurance beneficiary from Mr. Olson to Ms. Coleman. Ms. Olson violated the statutory injunction when she removed Mr. Olson as beneficiary. Upon Ms. Olson's death a few days later, the divorce action abated and the injunction was no longer effective. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008) ("It is a well-settled principle of law that a pending divorce action, being purely personal in nature, abates upon the death of one of the parties.").[5]

So the issue is – may Mr. Olson recover the life insurance proceeds from Ms. Coleman in this separate action based on Ms. Olson's violation of the statutory injunction in the Olsons' divorce case that has now abated? This is an issue of first impression in Tennessee. Courts in other states have different views on whether a trial court may provide an equitable remedy for the violation of an injunction after the abatement of a divorce action due to the death of a party. *See Aither v. Estate of Aither*, 913 A.2d 376, 379 (Vt. 2006); *Nw. Mut. Life Ins. Co. v. Hahn*, 713 N.W.2d 709, 712 (Iowa Ct. App. 2006) (acknowledging split in authority).

---

[5] *See also Owens v. Sims*, 43 Tenn. (3 Cold.) 544, 548–49 (1866); *Swan v. Harrison*, 42 Tenn. (2 Cold.) 534, 536–40 (1865).

In *Aither*, the Vermont Supreme Court considered a similar case where a husband removed his wife as the beneficiary on his life insurance policy in violation of an injunction that barred him from disposing of any marital asset while the divorce was pending. 913 A.2d at 377. The husband died before the divorce action was concluded and his wife asked the trial court to enforce the injunction. She argued that the trial court had the authority to enforce its order through its contempt authority and equitable principles. The trial court decided that it could not enforce the order because the divorce action had abated upon the husband's death. The Vermont Supreme Court reversed, holding that the trial court had the equitable power to award the life insurance proceeds to the wife. *Id.* at 378. The Vermont Supreme Court, in rejecting a rigid application of the abatement rule, explained that although the death of one party to a divorce abates the divorce action, a "mechanistic application" of the abatement rule "would frustrate the larger purpose of ensuring that courts have the power to enforce their own valid orders to avoid unjust results." At the same time, the *Aither* court noted that a per se rule voiding transfers in violation of an injunction would not be desirable. *Id.* at 379–80. Therefore, the Vermont Supreme Court adopted a flexible approach that would allow the trial court to remedy the violation of the injunctive order, after a divorce action had abated, by considering the equities of the parties. *See also Hahn*, 713 N.W.2d at 712 (concluding that a court may set aside a change in beneficiary of a life insurance policy made in violation of a temporary injunction); *American Family Life Ins. Co. v. Noruk*, 528 N.W.2d 921, 924 (Minn. Ct. App. 1995) (holding that equitable considerations control in determining ownership of policy proceeds when a change in beneficiary was made in violation of a temporary restraining order); *Standard Ins. Co. v. Schwalbe*, 755 P.2d 802, 806 (Wash. 1988) (holding that the death of a party did not deprive the trial court of equity jurisdiction to set aside a change in beneficiary done in violation of a preliminary injunction); *Wilharms v. Wilharms*, 287 N.W.2d 779, 784 (Wis. 1980) (stating that based on equitable principles, a constructive trust may be imposed on life insurance proceeds after a change in beneficiary in violation of a temporary restraining order). *But see Ex parte Thomas*, 54 So. 3d 356, 361 (Ala. 2010) (concluding that an interlocutory order in a divorce action may not be enforced after the death of one of the parties because abatement of that action divests the trial court of subject-matter jurisdiction); *Estate of Hackler v. Hackler*, 602 S.E.2d 426, 436 (Va. Ct. App. 2004) (finding no equitable remedy available after divorce case abated upon the death of one of the parties because the court no longer had jurisdiction over the parties' property).

We agree with the Court of Appeals that a divorce action abates upon the death of a party, but a trial court should have the authority to consider the equities of the parties and remedy the violation of a statutory injunction. This approach is consistent with the policy expressed in Tennessee Code Annotated section 36-4-106(d)(2) that the injunction "shall be in effect against both parties until the final decree of divorce or order of legal separation is entered, the petition is dismissed, the parties reach agreement, or until the court modifies or dissolves the injunction." Simply put, a trial court should have the authority to "right a wrong" and remedy an injustice based on equitable considerations

when a party violates a statutory injunction and later dies while the divorce action is pending.

Yet we disagree with the Court of Appeals' holding that the parties' equities favored a return of the life insurance proceeds to Mr. Olson. This is the first time we have considered this issue, and we are adopting a new approach that allows a court to consider the equities of the parties and provide an equitable remedy for a violation of the statutory injunction. Understandably, the parties did not anticipate the need to offer proof so that the trial court could consider an equitable remedy. Mr. Olson testified briefly about the marital assets and liabilities. Ms. Coleman offered no evidence regarding the equities, and the trial court made no findings of fact on this issue. As a result, there was insufficient evidence in the record for the Court of Appeals to make a determination about the equities of the parties. On remand, the trial court may hear additional evidence and consider the equities of the parties in determining whether either or both parties should receive all or a portion of the life insurance benefits.

*Grandparent Visitation*

A dispute over visitation between a parent and a grandparent raises a conflict between the parent's constitutional right to make decisions about the care and custody of the child and the grandparent's right to visitation under Tennessee Code Annotated section 36-6-306. *See Smallwood v. Mann*, 205 S.W.3d 358, 362–63 (Tenn. 2006). The right of a parent to raise a child is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution. *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Davis v. Davis*, 842 S.W.2d 588, 598–600 (Tenn. 1992)). Parents' rights to the care and custody of their children without undue government interference is "among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *Lovlace v. Copley*, 418 S.W.3d 1, 30 (Tenn. 2013) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *see also State ex rel. Bethell v. Kilvington*, 45 S.W. 433, 435 (Tenn. 1898) ("Ordinarily, the parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law."). Parents have a privacy interest that protects them from unwarranted state intervention in parental decision-making and prohibits the court from imposing its subjective notion of what is in the "best interests of the child." *Hawk*, 855 S.W.2d at 579–80.

Yet the state may interfere with these rights when there is a compelling state interest. *Smallwood*, 205 S.W.3d at 362–63 (citing *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996)). The state has a role of *parens patriae* and a duty to protect minors, and the state may intervene in parental decision-making when necessary to prevent substantial harm to the child. *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983) (citing *State Dept. of Human Servs. v. Northern*, 563 S.W.2d 197 (Tenn. Ct.

App. 1978)); *see also Hawk*, 855 S.W.2d at 581 (holding that "neither the legislature nor a court may properly intervene in parenting decisions absent significant harm to the child from those decisions"). The substantial harm requirement protects parents from unwarranted state interference in the parenting process. *Hawk*, 855 S.W.2d at 580. Absent substantial harm to the child, a trial court lacks a sufficiently compelling justification for interfering with the parents' privacy rights by ordering grandparent visitation. *Id.* at 582. In initial proceedings to determine grandparent visitation, parents have the presumption of superior parental rights. *Lovlace*, 418 S.W.3d at 30.

When Ms. Coleman filed the petition for grandparent visitation, Tennessee Code Annotated section 36-6-306 provided in part:

> (a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction, or juvenile court in matters involving children born out of wedlock . . . necessitates a hearing if such grandparent visitation is opposed by the custodial parent or parents . . .:
>
> (1) The father or mother of an unmarried minor child is deceased;[6]
>
> . . .
>
> (b)(1) In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation of the

---

[6] The other enumerated circumstances that require a hearing under Tennessee Code Annotated section 36-6-306(a) are

> (2) The child's father or mother are divorced, legally separated, or were never married to each other;
> (3) The child's father or mother has been missing for not less than six (6) months;
> (4) The court of another state has ordered grandparent visitation;
> (5) The child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent or parents . . .; or
> (6) The child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately preceding severance of the relationship, this relationship was severed by the parent or parents for reasons other than abuse or presence of a danger of substantial harm to the child, and severance of this relationship is likely to occasion substantial emotional harm to the child.

Tenn. Code Ann. § 36-6-306(a)(2)–(6).

relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:

(A) The child had such a significant existing relationship with the grandparent that loss of the relationship is likely to occasion severe emotional harm to the child;

. . .

(C) The child had a significant existing relationship with the grandparent and loss of the relationship presents the danger of other direct and substantial harm to the child.

. . .

(4) For the purposes of this section, if the child's parent is deceased and the grandparent seeking visitation is the parent of that deceased parent, there shall be a rebuttable presumption of substantial harm to the child based upon the cessation of the relationship between the child and grandparent.

(c) Upon an initial finding of danger of substantial harm to the child, the court shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307. Upon such determination, reasonable visitation may be ordered.

Tenn. Code Ann. § 36-6-306 (2010).

The trial court granted Ms. Coleman's petition for grandparent visitation after finding that her grandchild was at risk of substantial harm if their relationship ended based on the death of the child's mother and the child's close relationship with Ms. Coleman. These circumstances created a rebuttable presumption of substantial harm under Tennessee Code Annotated section 36-6-306(b)(4). The trial court explained that it doubted "Mr. Olson's willingness to allow visitation in the future except on his terms and other conditions that he would impose" and because the "animosity between the parties would make it difficult, if not impossible, for them to coordinate reasonable visitation . . . absent a Court Order."

The trial court made detailed findings of fact, and the evidence does not preponderate against those findings. Now, we must determine whether the trial court's finding of the likelihood of future parental opposition constitutes parental opposition as required by Tennessee Code Annotated section 36-6-306(a). The critical words of the statute provide: "Any of the following circumstances, when presented in a petition for grandparent visitation . . . necessitates a hearing if such grandparent visitation *is opposed*

15

*by* the custodial parent or parents . . . ." Tenn. Code Ann. § 36-6-306(a) (emphasis added).

We conclude that the Legislature's use of the words, "is opposed by," means actual existing opposition—not likely future opposition. Had the Legislature intended for evidence of anticipated or likely parental opposition to support an award of grandparent visitation, it could have so indicated by using the words "if such grandparent visitation is opposed *or likely will be opposed* by the custodial parent." The Legislature chose not to do so; we are not free to alter or amend the statute. Based on the plain meaning of Tennessee Code Annotated section 36-6-306(a), a petitioning grandparent must establish that the custodial parent opposes grandparent visitation.

Ms. Coleman could have proven parental opposition by presenting evidence of actual or constructive denial of visitation. Constructive denial occurs when the custodial parent limits or restricts the frequency or conditions of visitation so that it is the same as a denial of visitation. *Lovlace*, 418 S.W.3d at 21 (quoting *Huls v. Alford*, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at *8 (Tenn. Ct. App. Oct. 22, 2008)). A grandparent cannot rely on Tennessee Code Annotated section 36-6-306 to seek more or different visitation without a finding that the custodial parent actually or effectively opposed visitation. *Huls*, 2008 WL 4682219, at *8. Unless there is evidence of parental opposition to visitation, a trial court cannot consider whether the child is at substantial risk of harm under Tennessee Code Annotated section 36-6-306(b) or whether visitation would be in the child's best interest under subsection (c).

Ms. Coleman needed to show that Mr. Olson opposed visitation between the occurrence of the qualifying circumstance and the filing of the petition for visitation. Ms. Coleman's petition for grandparent visitation failed to allege the threshold requirement of parental opposition to visitation between the death of the child's mother on July 19, 2012, and the filing of the petition on February 12, 2013. Instead, Ms. Coleman alleged that she had exercised frequent visitation with the child since the child's birth up to the time she filed her petition for visitation. Ms. Coleman's allegations focused on her close relationship with her grandchild and the death of Ms. Olson and omitted *any* allegation that Mr. Olson denied her visitation.

The provisions of Tennessee Code Annotated section 36-6-306 for grandparent visitation are only triggered when there is parental opposition to grandparent visitation. Ms. Coleman did not prove parental opposition, and the trial court did not find parental opposition. The trial court's award of grandparent visitation was based on the likelihood of parental opposition and was well-intentioned given the trial court's assessment of the parties' contentious relationship. Yet Tennessee Code Annotated section 36-6-306 requires evidence of parental opposition, rather than evidence of the likelihood of future parental opposition, to grandparent visitation.

16

Ms. Coleman makes several arguments. First, she contends that she proved parental opposition by showing evidence of inability to cooperate. According to Ms. Coleman, the trial court's finding that cooperation over visitation is a "practical impossibility" is enough to comply with Tennessee Code Annotated section 36-6-306. We disagree. Tennessee Code Annotated section 36-6-306 requires evidence that the custodial parent opposes grandparent visitation, which means opposition existing when the petition is filed, not opposition likely to occur in the future.

Second, Ms. Coleman contends that there was evidence of parental opposition or only token visitation between Ms. Olson's death in July 2012, and the filing of the grandparent visitation petition in February 2013. Yet Ms. Coleman failed to allege or prove denial of visitation or token visitation, and the trial court did not make these findings of fact. Ms. Coleman relies on her testimony that Mr. Olson denied her visitation in August 2012 when he sent her a text message saying "[t]here's a complication with you taking [the child] on Friday." This single indication of a "complication" does not amount to opposition to visitation. There was also evidence that the day after Ms. Olson died, Mr. Olson texted Ms. Coleman and told her he was not trying to keep the child from her and offered to let her see the child. He also added, "I really want to work with you on this if you would just talk to me, I'm willing to do what I can for you []either of you." The July 2012 juvenile court order reflected Mr. Olson's agreement for Ms. Coleman to have visitation at her home in Massachusetts for three weeks in August 2012. In February 2013, Mr. Olson sent a text message to Ms. Coleman asking if she would like to see the child before she returned home and when she wanted visitation in June 2013. Ms. Coleman responded that she was no longer in town and Mr. Olson needed to communicate through his lawyer to her lawyer. In short, Ms. Coleman did not prove parental opposition or token visitation.

Third, Ms. Coleman argues that she had exercised "generous unsupervised visitation" but, except for the July 2012 agreed order for visitation in juvenile court, all her visitation was under a court order. This argument conflicts with Ms. Coleman's previous argument that she had been denied visitation. And Tennessee Code Annotated section 36-6-306 requires opposition to visitation and makes no exception for court-ordered visitation. Mr. Olson did not oppose visitation before Ms. Coleman filed the juvenile court petition, and he agreed to three weeks of visitation after the petition was filed. The juvenile court's order granting additional and continuing visitation without evidence of opposition does not constitute evidence that Mr. Olson opposed visitation.

Next, Ms. Coleman argues that her juvenile court petition and Mr. Olson's petition to the circuit court challenging the juvenile court's award of visitation are evidence of Mr. Olson's opposition to visitation. This argument ignores the fact that Ms. Coleman's juvenile court petition did not allege that Mr. Olson denied visitation during the four-day period between Ms. Olson's death on July 19, 2012, and the filing of the petition on July 23, 2012. Simply put, there is no evidence that Ms. Coleman *had* to file the juvenile court

17

petition for custody or visitation only days after her daughter's death. Ms. Coleman admitted that she likely contributed to the discord between the parties by filing the juvenile court petition. Ms. Coleman admitted that after she filed the juvenile court petition, Mr. Olson agreed that she could have three weeks of visitation. Mr. Olson's text messages to Ms. Coleman support his contention that he did not oppose visitation. Mr. Olson's challenge of the juvenile court order was based, in part, on the juvenile court's lack of authority under Tennesee Code Annotated section 36-6-306 to adjudicate a grandparent visitation case where the child is not born out of wedlock and on the juvenile court's additional grant of visitation in September and November 2012 without hearing any evidence.

Finally, Ms. Coleman contends that the acrimony between her and Mr. Olson and his mistreatment of Ms. Olson supports the conclusion that future cooperation between the parties about visitation would be impossible. Citing the dissenting opinion in *Uselton v. Walton*, No. M2012-02333-COA-R3-CV, 2013 WL 3227608, at *19 (Tenn. Ct. App. June 21, 2013) (Highers, J., dissenting), Ms. Coleman argues that we should consider evidence of post-petition opposition to visitation. Again, these arguments fail because Tennessee Code Annotated section 36-6-306 requires evidence of parental opposition when the petition is filed and requires evidence of existing opposition, not future opposition.

In short, Ms. Coleman failed to allege and prove parental opposition to visitation. We agree with the Court of Appeals that the trial court erred by awarding Ms. Coleman grandparent visitation under Tennessee Code Annotated section 36-6-306 absent evidence of parental opposition.

### III.

In summary, we hold that Ms. Olson violated the statutory injunction imposed by Tennessee Code Annotated section 36-4-106(d)(2) when she removed Mr. Olson as her life insurance beneficiary. The Olsons' divorce action abated when Ms. Olson died and the statutory injunction became ineffective. A trial court, after the abatement of a divorce action, may remedy a violation of the statutory injunction by considering the equities of the parties. Here, the trial court erred by awarding the life insurance benefits to the Olsons' child based on the pleadings and evidence in the case. The Court of Appeals erred by awarding the life insurance benefits to Mr. Olson absent sufficient evidence of the equities of the parties. On remand, the trial court, after hearing additional evidence and considering the equities of the parties, may remedy the violation of the statutory injunction by awarding all or a portion of the life insurance proceeds to either or both parties. In addition, Ms. Coleman was not entitled to court-ordered grandparent visitation absent Mr. Olson's opposition to visitation.

We affirm in part and reverse in part the judgment of the Court of Appeals, and we reverse and vacate the judgment of the trial court and remand to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal equally between Rose Coleman and Bryan Olson, for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE