IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2023 Session

**DEBORAH FLY ET AL. V. HALEY RAE FLY ET AL.**

**Appeal from the Juvenile Court for Wilson County**
**No. 2021-DN-101   Charles B. Tatum, Judge**

_____

**No. M2022-01089-COA-R3-JV**

_____

A grandparent petitioned for visitation with her grandchild.  The juvenile court found that the loss or severe reduction of visitation with the grandparent would cause severe emotional harm.  The child's mother appeals.  Because the evidence preponderates against the court's finding that denial of grandparent visitation would cause severe emotional harm, we reverse.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Cody Johnson, Nashville, Tennessee, for the appellant, Haley Fly.

Tiffany D. Hagar, Lebanon, Tennessee, for the appellee, Deborah Fly.

Jonathan Skrmetti, Attorney General and Reporter, Andrée Sophia Blumstein, Solicitor General, and Amber L. Barker, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.**

**A.**

Haley Fly ("Mother") is the mother of one child (the "Child").  In May 2019, Mother divorced the Child's biological father and was granted sole custody of her then two-year-

old. Following the divorce, Mother moved in with her father, Rick Fly ("Grandfather"). Over the nearly two-year period they lived together, Grandfather saw the Child almost daily.

That was not true for Mother's mother, Deborah Fly ("Grandmother"), who was divorced from Grandfather. When Mother and the Child first moved in with Grandfather, Grandmother did not see the Child at all. As Grandfather would later explain, Mother and Grandmother had a falling out and were not communicating. The breakdown in the relationship occurred sometime around the Child's first birthday.

Eventually, hoping to build back a relationship and at Grandfather's urging, Mother consented to the Child visiting with Grandmother. Grandmother saw the Child approximately six times in 2019. The following year, Grandmother kept the Child on roughly alternating weekends. Because Grandmother lived some distance away, they would exchange the Child at an interstate exit along the route. Grandmother would have the Child from Friday until Sunday.

In addition to weekends, Grandmother also kept the Child for longer stretches of time. During the start of the COVID-19 pandemic, Grandmother kept the Child for an extended period. And she would keep the Child for a week in the summer and at certain out-of-state holiday gatherings of Grandmother's family.

Visitation ended for both grandparents when Mother abruptly left Grandfather's home with the Child on March 19, 2021. The suddenness of Mother's departure, in which she left behind some of the Child's clothing and toys, caused the grandparents to fear for the safety of Mother and the Child.

B.

Later that summer, Grandmother and Grandfather petitioned to have the Child declared dependent and neglected or, alternatively, for "substantial visitation" under the Grandparent Visitation Statute. *See* Tenn. Code Ann. § 36-6-306 (2021). The petition alleged that they had located Mother and the Child living with a man in Wilson County. The Child allegedly had special needs and was "not receiving the necessary care and attention vital to her well-being."

The petition led to the removal of the Child from Mother's care and a placement with the grandparents for a week. After the court ordered the Child's return to Mother, Grandfather reestablished contact with Mother. He visited her home and found that both Mother and the Child were safe. Mother also told Grandfather that he could visit with the Child as her schedule permitted. So Grandfather decided not to pursue the petition further.

2

Grandmother pressed on with the petition alone. When the matter came on for final hearing, Grandmother elected to pursue only her alternative relief, grandparent visitation. The hearing took place over two days separated by several weeks.

The proof showed that Grandmother and Mother had a relationship fraught with difficulties starting in Mother's early teens. In her testimony, Grandmother recounted some of Mother's diagnoses and struggles in school. Mother left Grandmother's home at age 18 when she married the Child's father. After that, Grandmother had no contact with Mother until after the Child's birth.

When Mother reached out to her about the birth, Grandmother took advantage of the opportunity to visit the Child, but Mother stopped responding to Grandmother around the Child's first birthday. Grandmother felt Mother's action related to Grandmother's decision not to attend the Child's birthday party. Grandmother had received reports from Grandfather about the erratic behavior of the Child's father and the possibility of drug use. Given this information, Grandmother "did not feel comfortable going and meeting [the father's] family for the first time and knowing that something was going on with [the father's] condition." Grandmother apparently expressed this discomfort to Mother, and Mother stopped responding to Grandmother's text messages and phone calls after that.

Mother reestablished contact after she divorced the father and moved in with Grandfather. Grandmother visited with the Child in the summer of 2019, and she was permitted to take the Child with her on a visit to the home of her parents, the Child's great-grandparents. Visits continued approximately every other weekend until the COVID-19 pandemic. Because Grandmother was working from home during the pandemic, she asked Mother for permission to spend more time with the Child and to work with her at Grandmother's home, which Mother permitted.

Grandmother opined that the Child "was not developmentally where she should be." Grandmother also believed that the Child needed more social interactions with other children. She cited as evidence that the Child did not talk or really express herself after they became reacquainted. And Grandmother was concerned that the Child was still in diapers. In their extended time together during the pandemic, Grandmother started potty training and helped the Child with her letters and numbers. They also spent time developing skills that Grandmother felt were necessary for preschool.

Even after her first visit with the Child in 2019, Grandmother expressed her concerns to Mother that "things aren't right." Grandmother "called around and looked for opportunities for help [where Mother lived] and did get connected with the school system and got an interview scheduled to have [the Child] tested." Grandmother saw similarities between the Child's issues and the difficulties Mother experienced as a child.

3

Grandmother's intervention had consequences for her relationship with Mother. Grandmother recalled attending a school meeting to discuss an individualized education program, or IEP, for the Child. When Grandmother disagreed with Mother's assessment of the Child's abilities, Grandmother spoke up in disagreement. And even though the testing showed the Child was behind and an IEP was created for her, Mother later informed the school that she did not want Grandmother to have any further involvement with the plan.

At the final hearing, Grandmother testified that she considered Mother an unfit parent. In her view, Mother had difficulties of her own and needed help raising a child.

Mother acknowledged cutting off both grandparents when she left Grandfather's home. She left because she "was afraid for [her] life and [her] child's life." Around that time, she discovered text messages between Grandmother and Grandfather discussing a proposal for Grandmother's older sister and her husband to adopt the Child because Mother was unfit. As Mother explained it, they were "kind of conspiring against [her]," and she "freaked out." Additionally, she felt like she needed some space. The grandparents "were just kind of smothering [her] and not letting [her] parent [her] own child."

After leaving Grandfather's home, Mother moved back in with the Child's father. She lived with the father for less than two months. She then moved in with a man she met through an online dating site. By the time of the final hearing, the man had become Mother's fiancé.

Since the filing of the dependency and neglect petition, Grandfather had reestablished contact with Mother and the Child. He testified that, after the court's order returning custody of the Child to Mother, he reached out to Mother to "apologize[] for what we did, taking that child away from her." He had seen the home that Mother shared with the Child and her fiancé. He described it as "a nice place and safe and clean and neat." And seeing that the Child was safe and happy, he decided not to pursue the dependency and neglect petition or seek court-ordered visitation.

While Grandfather was permitted to see the Child and Mother felt it would cause the Child harm not to have a relationship with Grandfather, Mother had a different view of Grandmother. She did not believe the lack of a relationship with Grandmother would cause the Child harm. Instead, she believed that the relationship could cause harm. Mother acknowledged that her belief was based on her own experience being raised by Grandmother.

At the conclusion of the hearing, the court found that Grandmother was entitled to visitation under the Grandparent Visitation Statute. It granted her a week in June and a week during the Child's Christmas break. And the court awarded Grandmother one weekend of visitation during the months of February, April, August, and October. The

4

court also ordered Mother to permit a weekly video call between Grandmother and the Child of up to 15 minutes.

## II.

Both the federal and state constitutions protect the fundamental right of parents to raise and make decisions about the care and custody of their children. *Coleman v. Olson*, 551 S.W.3d 686, 697-98 (Tenn. 2018) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993)). Only when a "substantial harm threatens a child's welfare" does the state have "a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit." *Hawk*, 855 S.W.2d at 577. So, "in initial proceedings to determine grandparent visitation," parents may "rely upon the protection of the presumption of superior parental rights." *Lovlace v. Copley*, 418 S.W.3d 1, 30 (Tenn. 2013). But the presumption can be rebutted by a showing that the denial of grandparent "visitation would result in substantial harm to the child and that grandparent visitation would be in the child's best interests." *Id.*

The Grandparent Visitation Statute codifies these principles in a three-part analysis. First, the court must determine whether grandparent visitation has been opposed or severely reduced by the parent under one of six factual scenarios. *See* Tenn. Code Ann. § 36-6-306(a). Second, the court must find "a danger of a substantial harm to the child" and that the grandparent either "functioned as a primary caregiver" of the child or had "a significant existing relationship" with the child. *Id.* § 36-6-306(b). Third, if a danger of substantial harm to the child is found, the court must determine whether grandparent visitation would be in the child's best interests. *Id.* § 36-6-306(c). Only then may a court order reasonable visitation with the grandparent. *Id.*

### A.

Appealing the grant of visitation to Grandmother, Mother raises five issues for review. The first three issues raise constitutional challenges to the Grandparent Visitation Statute. The final two dispute the court's factual findings. We begin by considering the factual findings. Because this was a bench trial, our review is de novo on the record with a presumption that the trial court's factual findings are correct, unless the evidence preponderates against them. TENN. R. APP. P. 13(d). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001).

Mother argues that the evidence does not support the court's finding that she opposed Grandmother's visitation. She never explicitly opposed visitation; she only "needed time to get settled in her new home and life" before resuming visitation. And she highlights two texts that she sent to Grandmother days after leaving Grandfather's home

indicating that Mother would permit visitation once she had "everything situated" or got where she was going.

Mother's argument is directed at the first part of Grandparent Visitation Statute analysis. A grandparent may not petition a court for "more or different visitation without a finding that the custodial parent actually or effectively opposed visitation." *Coleman*, 551 S.W.3d at 700 (citing *Huls v. Alford*, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at *8 (Tenn. Ct. App. Oct. 22, 2008)). This threshold finding must be made before either substantial harm or the child's best interest can be considered. *Id.*

Here, the threshold was crossed. Mother may not have explicitly said that she opposed visitation by Grandmother. But she took steps to ensure that visitation did not occur by leaving suddenly and not informing Grandmother of her new address. Mother acknowledged that she never permitted Grandmother any visitation after leaving Grandfather's home. And Mother testified that she felt Grandmother could cause the Child harm. The evidence does not preponderate against the court's finding that Mother opposed visitation by Grandmother.

Mother also argues that the evidence does not support the court's finding that the denial of visitation would cause severe emotional harm. Beyond that, she complains that the court's order "is devoid of any factual basis for the court's findings" of severe emotional harm.

As noted above, "[a]bsent some harm to the child . . . the state lacks a sufficiently compelling justification for interfering with [a parent's child-rearing decisions]." *Hawk*, 855 S.W.2d at 582. Under the Grandparent Visitation Statute, a court may find "the presence of a danger of substantial harm to the child" if it is shown that "[t]he child had such a significant existing relationship with the grandparent that loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child." Tenn. Code Ann. § 36-6-306(b)(1)(A). The parties do not dispute that Grandmother had "a significant existing relationship" with the Child. Grandmother "had frequent visitation with the child . . . for a period of not less than one (1) year." *Id.* § 36-6-306(b)(2)(C). So the question becomes whether loss or reduction of that relationship would occasion severe emotional harm.[1]

The court found that the Child would suffer severe emotional harm. But we agree with Mother that the court did not make many, if any, subsidiary factual findings to show how it reached that determination. *See Lovlace*, 418 S.W.3d at 35 (recognizing that

---

[1] Grandmother contends that the proof also supports a finding that loss of grandparent visitation "presents the danger of other direct and substantial harm to the child." *See* Tenn. Code Ann. § 36-6-306(b)(1)(C). But the court's grant of visitation to Grandmother is clearly premised on a severe emotional harm finding.

"findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue" (quoting 9C CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2579, at 328 (3rd ed. 2005))). In considering the harm, the court reasoned as follows:

> . . . the Court finds that there was based upon the Reasonable Man Test, that loss or severe reduction of the relationship is likely to occasion severe emotional harm. The Court thinks not only is it likely, but it would cause severe emotional harm under T.C.A. §36-6-306(b)(2) since the child resided with the grandparents for at least six consecutive months and then Mother cut Grandmother out of the minor child's life completely. The Court thinks when you severely reduce, it may require briefly, it may require technical definitions. Certainly, the statute applies where we have a child of parents who are divorced. The child needs as many people in her circle who she can identify with as family members, that she can trust, and that she can count on. Hopefully, the connection and love that people have is unconditional. It is not contractual. It is because they are blood, they are kin, and they care about that child.

Yet, in the next paragraph of the order, the court also acknowledged that it did "not have really any significant proof in front of [it] about what issues [the Child] might have in the future, or in projection of the future."

Under the Grandparent Visitation Statute, grandparents are "not required to present the testimony or affidavit of an expert witness in order to establish . . . that the loss or severe reduction of the [grandparent/grandchild] relationship is likely to occasion severe emotional harm to the child." Tenn. Code Ann. § 36-6-306(b)(3). Rather, the court must "consider whether the facts of the particular case would lead a reasonable person to believe . . . that the loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child." *Id.* Still, given the fundamental rights of the parent, this Court has previously noted the burden to establish such harm is "high" and "exacting." *McGarity v. Jerrolds*, 429 S.W.3d 562, 578, 579 (Tenn. Ct. App. 2013).

After a thorough review, we find that the burden was not met and that the evidence preponderates against the factual finding that the Child would likely suffer severe emotional harm. At the outset, we note the Child did not "reside[] with the grandparents for at least six consecutive months." The Child resided with Grandfather for at least six consecutive months. Much of the proof about the Child's interactions with Grandmother, although significant, centered on Grandmother's commendable work in fostering the Child's social, emotional, and educational development, particularly during the pandemic. But, as the Court remarked, there was no significant proof of any issues the Child might face now or in the future. The closest the proof came to addressing any harm was the

7

testimony of Grandmother's sister. She suggested that the Child might blame herself for the loss of visitation with Grandmother.

Beyond the speculation of Grandmother's sister, the only proof of how the Child was faring came from Mother and Grandfather. They both testified that the Child was happy. But even were we to assume that the court did not credit this testimony, the other proof presented does not establish a likelihood of severe emotional harm to the Child. *See* Tenn. Code Ann. § 36-6-306(b)(1)(A). Instead, the court appeared to make a judgment that a child of divorce would benefit from a large circle of family members. That may be true, but it cannot substitute for the need to show a harm to the child, which "is the sole protection that parents have against pervasive state interference in the parenting process." *Hawk*, 855 S.W.2d at 580.

## B.

Because we have determined that Grandmother failed to meet her burden of proof under the Grandparent Visitation Statute, we do not reach Mother's constitutional challenges to the statute. A court should "not pass on the constitutionality of a statute, or any part of one, unless it is absolutely necessary for the determination of the case and of the present rights of the parties to the litigation." *State v. Murray*, 480 S.W.2d 355, 357 (Tenn. 1972).

## III.

The evidence preponderates against the court's finding of severe emotional harm. Because Grandmother failed to meet her burden of proof under the Grandparent Visitation Statute, we reverse.[2] The case is remanded to the juvenile court for such further proceedings as are necessary and consistent with this opinion.

_____s/ W. Neal McBrayer_____
W. NEAL MCBRAYER, JUDGE

---

[2] After oral argument in this case, Mother moved the juvenile court to stay its order granting visitation pending appeal. *See* TENN. R. CIV. P. 62.04. On October 23, 2024, the juvenile court denied the motion. Mother seeks our review of the order denying her motion to stay. *See* TENN. R. APP. P. 7(a). Although we reverse the grant of grandparent visitation, having reviewed the motion and supporting documents and Grandmother's response, we find no grounds to reverse the juvenile court's decision on the requested stay. So the motion for review is denied.