# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 7, 2021 Session

## GUIDESOFT, INC. D/B/A KNOWLEDGE SERVICES v. STATE PROTEST COMMITTEE, STATE OF TENNESSEE, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 19-1161-I    Patricia Head Moskal, Chancellor**

_____

### No. M2020-00964-COA-R3-CV

_____

This appeal concerns a bid protest. UWork.com, Inc., d/b/a Covendis Technologies ("Covendis") successfully bid on a contract to manage a network of temporary workers for the State of Tennessee. Guidesoft, Inc. d/b/a Knowledge Services ("Knowledge Services"), an unsuccessful bidder, filed a protest with the Central Procurement Office ("the CPO"). The CPO dismissed Knowledge Services' bid for insufficient bond. Knowledge Services appealed to the State Protest Committee ("the Committee"), which denied the appeal. Knowledge Services then filed a petition for common law writ of certiorari in the Chancery Court for Davidson County ("the Trial Court"). After a hearing, the Trial Court dismissed Knowledge Services' amended petition. Knowledge Services now appeals to this Court, arguing that under Tenn. Code Ann. § 12-3-514(d), its protest bond should be based on 5% of the lowest evaluated cost proposal rather than 5% of the State's estimated maximum liability as found below. We hold, *inter alia*, that the protest bond statute is meant to protect the State, and the appropriate protest bond amount is based on the costs the State may incur rather than a bidder's proposed cost. Further, the fee relied upon by Knowledge Services to calculate its protest bond is but a small portion of the contract at issue, which is estimated to cost the State $190,000,000. The Committee did not exceed its jurisdiction or act illegally, arbitrarily, or fraudulently. We affirm the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Darwin A. Hindman, III, and Rachael C. Haley, Nashville, Tennessee, for the appellant, Guidesoft, Inc. d/b/a Knowledge Services.

David R. Esquivel and Jeffrey P. Yarbro, Nashville, Tennessee, for the appellee, UWork.com, Inc., d/b/a Covendis Technologies.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Eugenie B. Whitesell, Senior Assistant Attorney General; and, Janie C. Porter, Senior Assistant Attorney General Education and Employment Division, for the appellee, the State Protest Committee, State of Tennessee.

## OPINION

## Background

In response to a Request for Proposal ("the RFP") issued by the CPO, Knowledge Services and Covendis bid for a statewide contract to provide managed services for Tennessee's contingent workforce. The RFP called for a managed service provider ("MSP") to manage the State's staff augmentation, to include establishing and managing a sub-vendor network. Knowledge Services was the incumbent MSP. The State's estimated maximum liability under the RFP was $190,000,000. The contractor would be compensated under the contract by retaining a percentage of the maximum bill rate. The MSP fee—the percentage of the bill rate kept by the MSP—would be deducted from the rate received from a sub-vendor. Each bidder was required to submit two separate parts to their bid: a Technical Response, and a Cost Proposal. In the Cost Proposal, each bidder offered a bid rate that was a percentage mark-up of the amounts charged by sub-vendors to the State for labor. The CPO then converted this bid rate to an amount on a Cost Proposal evaluation score sheet, and the bidder with the lowest evaluated cost amount would be assigned all 20 points possible in the category. Higher bidders would be assigned a scaled score based on a formula using the lowest evaluated cost amount. Covendis offered a bid rate representing a .75% mark-up of the sub-vendor charges to the State. Covendis received all 20 points for its Cost Proposal.

In May 2019, the State issued its notice of intent to award the RFP to Covendis. In its notice, the State provided that in the event of a protest, the protest bond was $9,500,000—or 5% of the State's estimated maximum liability under the RFP. In so doing, the CPO applied Tenn. Code Ann. § 12-3-514(d)(2) which bases the protest bond on the State's estimated maximum liability. Knowledge Services timely filed a protest with the CPO asserting that the State acted arbitrarily and capriciously in awarding the contract to Covendis. In its bid protest, Knowledge Services asserted that Covendis lacked sufficient experience in certain key areas. Knowledge Services contemporaneously submitted a protest bond of $71,250—5% of Covendis' lowest evaluated Cost Proposal of .75% of the estimated maximum liability—rather than the $9,500,000 required by the CPO. It was,

-2-

and is, Knowledge Services' contention that Tenn. Code Ann. § 12-3-514 subsection (d)(1) rather than (d)(2) should have been applied here. Nevertheless, the CPO dismissed Knowledge Services' protest on grounds that its bond was insufficient. Tenn. Code Ann. § 12-3-514 provides as follows, in part:

> (b) Any respondent who has submitted a response to a solicitation authorized under this chapter and who claims to be aggrieved in connection with the solicitation, award, or proposed award of a contract may protest to the chief procurement officer. The protest shall be submitted in writing within seven (7) calendar days after the earlier of the notice of the award or intent to award the contract is issued. Any issues raised by the protesting party after the seven-day period to protest shall not be considered as part of the protest. Upon receipt of a protest of a solicitation, award, or proposed award of a contract, and a protest bond as required in subsection (d), a stay of the solicitation, award, or proposed award shall be in effect until the protest is resolved as provided under this section.

> ***

> (d) A protest under this section is not actionable unless the protesting party submits a protest bond contemporaneously with a protest. A protest bond shall be payable to the state in the amount of:

> (1) Five percent (5%) of the lowest bid or cost proposal evaluated;

> (2) Five percent (5%) of the maximum liability or estimated maximum liability provided in the solicitation;

> (3) Five percent (5%) of the estimated maximum revenue, if the solicitation, award, or proposed award is for a contract in which the state receives revenue; or

> (4) For no-cost contracts, an amount to be determined by the chief procurement officer.

> (e) The protest bond shall be in form and substance acceptable to the state and shall be surrendered to the state after the protesting party has had an opportunity to oppose the payment of the protest bond and after a finding by the protest committee that:

(1) The protest was signed, before or after appeal to the chief procurement officer or protest committee, in violation of subsection (c);

(2) The protest has been brought or pursued in bad faith;

(3) The affected state agency has suffered damages resulting in a loss of funding, increased expenditures, or a disruption in services; the protest was filed in bad faith or in violation of subsection (c); and the protest was not upheld;

(4) The protest did not state on its face a valid basis for protest; or

(5) For any other reason approved by the protest committee.

***

(h) The chief procurement officer, in consultation with the head of the state agency, has authority to resolve the protest. The chief procurement officer shall resolve the protest within sixty (60) calendar days after a protest is filed. The final determination of the chief procurement officer shall be made in writing and submitted to the protesting party, the protest committee, and the comptroller of the treasury. If the chief procurement officer fails to resolve the protest within sixty (60) calendar days, then the protesting party may request that the protest committee meet to consider the protest. The chief procurement officer shall provide the minutes of the protest proceedings to each committee member and to the comptroller of the treasury and shall post the final determination within fifteen (15) business days to the website of the central procurement office. A request for consideration before the protest committee shall be made in writing within seven (7) calendar days from the date of the chief procurement officer's final determination or within seven (7) calendar days following the chief procurement officer's failure to resolve the protest within sixty (60) calendar days after receipt of the protest.

(i) A stay made pursuant to subsection (b) shall not be lifted unless, after giving the protesting party an opportunity to be heard, the chief procurement officer or the protest committee makes a written determination that continuation of the procurement process or the award of the contract without further delay is necessary to protect the interests of the state.

***

-4-

(l) Protests appealed to the chancery court from the protest committee shall be by common law writ of certiorari. The scope of review in the proceedings shall be limited to the record made before the protest committee and shall involve only an inquiry into whether the protest committee exceeded its jurisdiction, followed an unlawful procedure, or acted illegally, fraudulently, or arbitrarily without material evidence to support its action.

Tenn. Code Ann. § 12-3-514 (2019).[1]

Knowledge Services appealed the CPO's decision to the Committee. After a July 2019 hearing, the Committee denied Knowledge Services' appeal. The Committee found that pursuant to Tenn. Code Ann. § 12-3-514(e), the CPO had the authority to determine whether a protest bond is acceptable to the State; that the CPO rather than the protesting party determines the amount of the bond based on the type of contract; and that a protest bond in form and substance acceptable to the State was a jurisdictional requirement. Finally, the Committee found that the protest bond should be returned to Knowledge Services and no sanctions were warranted.

Under Tenn. Code Ann. § 12-3-514(l), the manner in which to appeal to chancery court the Committee's decision on a protest is by common law writ of certiorari. In September 2019, Knowledge Services filed its petition for common law writ of certiorari in the Trial Court seeking review of the Committee's decision. In October 2019, Knowledge Services filed an amended petition adding Covendis as a party. In February 2020, Knowledge Services filed a motion to supplement the record seeking to introduce two pieces of supplemental evidence: (1) the RFP and protest bond documents from a Solicitation run by the CPO in 2019 ("the Credential RFP"); and (2) the RFP and protest bond documents from the Solicitation run by the CPO in 2013 ("the 2013 RFP"). According to Knowledge Services, the Credential RFP contradicted certain evidence before the Committee as to the CPO's alleged "longstanding" practice of interpreting Tenn. Code Ann. § 12-3-514(d). In addition, Knowledge Services stated that the 2013 RFP contradicted evidence before the Committee regarding what constitutes the "lowest evaluated cost proposal" under Tenn. Code Ann. § 12-3-514(d)(1) and how it is calculated. Knowledge Services alleged that the Committee's interpretation of Subsection (d)(1) was

---

[1] Prior to a 2015 amendment, *see* 2015 Tenn. Pub. Ch. 272, § 2 (eff. April 28, 2015), the statute contained the following single method for calculating protest bonds: "The protesting party shall post with the chief procurement officer, at the time of filing a notice of protest, a bond payable to the state in the amount of five percent (5%) of the lowest cost proposal evaluated or, if a protest is filed prior to the opening of cost proposals, the bond payable shall be five percent (5%) of the estimated maximum liability provided in the procurement document." Tenn. Code Ann. § 12-3-514(c) (West July 1, 2013 to April 27, 2015).

based on incorrect or incomplete evidence and that the Committee thus acted illegally, arbitrarily, and capriciously. This matter was heard in March 2020.

In June 2020, the Trial Court entered its final order. The Trial Court denied Knowledge Services' motion to supplement the record and dismissed its amended petition. The Trial Court stated, in part:

> After hearing argument on the motion, the Court determined at the hearing that Knowledge Services' request to supplement the record should be denied. Under the express provisions of the bid protest statute, appeals to chancery court are by common law writ of certiorari and the scope of the chancery court's review "shall be limited to the record made before the protest committee." Tenn. Code Ann. § 12-3-514(*l*). Neither the parties nor the Court is aware of any cases construing this provision. The Court concludes that the general body of case law applicable to common law writs of certiorari, permitting additional evidence to be considered by the reviewing court under certain circumstances, does not apply to judicial review of bid protests where the legislature has expressly limited chancery court's review to the record before the state protest committee. Courts are required to ascertain and give effect to the intent of purpose of legislation based on the plain and ordinary meaning of the language used … The legislature plainly stated that the scope of judicial review is limited to the record before the state protest committee. The Court construes Tenn. Code Ann. § 12-3-514(*l*) as limiting the courts review of bid protests to the record before the state protest committee.

> The Court additionally finds that both the 2013 and 2019 requests for proposal were in existence and available at the time of the hearing before the State Protest Committee. Knowledge Services could have offered those documents at that hearing, but did not do so. The Court further finds that neither … the 2013 or 2019 solicitation is relevant to the present case. The 2013 solicitation (which is the predecessor contract to the current RFP) pre-dated the current version of the bid protest statute at issue here, establishing the amount of the protest bond based on the type of contract solicited. The 2019 solicitation involved a different type of contract that was not based on the State's "estimated liability" under the contract. For these reasons, the Court respectfully denies Knowledge Services' motion to supplement the record.

***

-6-

In reviewing the plain language of the protest statute, the Court finds that it provides four different methods of calculating protest bonds. Subsections (*d*)(*1*) and (*d*)(*2*) do not specify the type of contract to which each applies, while subsections (*d*)(*3*) and (*d*)(*4*) do specify the type of contract. In comparing the four subsections, however, it is evident that the first two subsections apply to cost-type contracts to the State, as contrasted with no-cost or revenue contracts in the latter two subsections. In analyzing the language used in (*d*)(*1*) and (*d*)(*2*), a distinction is drawn between the cost method or pricing to the State. Subsection (*d*)(*1*) contemplates a contract with a fixed cost proposal, in which the actual cost or liability of the State for the goods or services to be provided is quantified. Subsection (*d*)(*2*) contemplates a contract where the actual cost or liability of the State is not known or guaranteed and the actual cost may vary over the contract term. Instead of quantifying the actual cost, the State caps its maximum liability or estimated maximum liability based upon the State's anticipated needs or utilization under the RFP. While the four alternative provisions are written using the disjunctive, the plain language used and differences in the cost or pricing structure of the alternative provisions leads the Court to conclude that the legislative intent is for a separate method of calculating bond amounts to correspond to the types of contracts and cost structures that the State uses in its contract solicitations. The Court further finds that those alternatives are intended to be mutually exclusive.

To the extent there is any ambiguity in the language used in subsections (*d*)(*1*) or (*d*)(*2*), the Court finds that the legislature's 2015 amendment to the protest bond statute, reflects an intent to shift away from using a single method of calculating the bond (5% of the lowest cost proposal evaluated, unless the protest was filed before the cost proposals were opened) to using four alternative methods of calculating the bond based on the contract type and cost structure of the request for proposal. The Court further finds that the legislature did not intend to leave alternative bond calculations up to the aggrieved bidders, allowing them to simply choose (at least as between (*d*)(*1*) and (*d*)(*2*)) the lower bond amount they prefer to post. Such a construction would render subsection (*d*)(*2*) largely inoperative or superfluous in those solicitations where the State's costs or liability are unknown, but are estimated over the life of the contract. Leaving the bond amount up to a bidder's choice could also lead to an absurd result, allowing several competing and aggrieved bidders protesting the same solicitation to calculate and post bonds in different amounts. The Court concludes that the cost structure of the contract solicited and the corresponding method of calculating the protest bond amounts are based on four alternatives: a

contract for a specified or fixed cost to the State under (*d*)(*1*), a contract with an open-ended, unknown cost or liability to the State as to which the State has estimated its maximum liability under (*d*)(*2*), a revenue contract to the State based on an estimate of the maximum revenues under (*d*)(*3*), or a no-cost contract based on the CPO's determination as to the bond amount under (*d*)(*4*).

The foregoing construction of the protest bond statute and the decision of the State Protest Committee is further supported by material facts in the record. The terms of the RFP did not require the bidders to propose fixed pricing or fixed costs to the State in terms of dollars, nor did the RFP require the State to evaluate the cost proposals. As a result, there was no "lowest bid" or "lowest cost proposal evaluated" that would allow Knowledge Services to calculate the bond under subsection (*d*)(*1*). Even though the RFP included a "Cost Proposal" form, the terms of that form and the RFP required the bidders to propose, as the compensation they would receive, a percentage of the maximum bill rate to be charged to the State based on the volume of services the State ultimately utilizes. The RFP did not ask the bidders to propose the actual or fixed compensation they would receive the managed services fee they would retain from the maximum bill rate. The State evaluated the proposed percentage rates, which translates to the compensation the successful bidder will be paid, in an amount to be determined, that is a function of the State's utilization of workforce services under the RFP over the duration of the contract.

Knowledge Services also challenges the CPO's asserted reliance on Tenn. Code Ann. § 12-3-514(*e*) as granting the CPO broad discretion to determine the amount of the bond, which the State Protest Committee also upheld in its Summary of Decision. Subsection (*e*) provides that the "protest bond shall be in form and substance acceptable to the state …" Tenn. Code Ann. § 12-3-514(*e*). Other than the dispute concerning the amount of the protest bond, however, no additional issues are raised by any party as to alleged deficiencies in the "form and substance" of the protest bond submitted by Knowledge Services. The Court finds that the protest bond amount specifically is determined under subsection (*d*), and is separate from the general "form and substance" of the bond that is acceptable to the State as required under subsection (*e*).

Knowledge Services generally complains in its Amended Petition that the State Protest Committee acted illegally, fraudulently, or arbitrarily under Tenn. Code Ann. § 12-3-514. The bid protest statute grants the CPO authority, in consultation with the head of the state agency, to resolve bid protests. Tenn. Code Ann. § 12-3-514(*h*). This authorization includes the

-8-

ability to resolve all issues raised by a protest, including the amount of the bond. As provided under the protest statute, Knowledge Services filed a protest of the contract award under the RFP with the CPO. The CPO made a determination that the bond amount submitted by Knowledge Services was insufficient and dismissed the protest. He made his determination in writing. Knowledge Services requested review of the CPO's decision by the State Protest Committee. The State Protest Committee met and upheld the CPO's decision. Knowledge Services did not identify any procedural error committed by the State Protest Committee that was unlawful under Tenn. Code Ann. § 12-3-514. Based on these facts as established by the record, the Court concludes that the State Protest Committee did not act illegally, fraudulently, or arbitrarily under Tenn. Code Ann. § 12-3-514 in upholding the decision of the CPO.

Knowledge Services presses the additional argument that by requiring a protest bond of $9,500,000, where the value of the contract to the successful bidder is only $1,425,000 in profits, has a chilling effect on aggrieved bidders and undermines the purposes of competitive solicitations to ensure fair competition and discourage abuse in the public procurement of goods and services. In support of this argument, Knowledge Services points out that while all states have public procurement statutes that include provisions for unsuccessful bidders to protest big awards, only four states, including Tennessee, impose a protest bond requirement. Knowledge Services claims the requirement of protest bonds is so limited because protest bonds tend to discourage bidders from protesting and participating in the public bidding process. The Court finds this policy-based argument is best addressed to the legislature.

Knowledge Services timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Knowledge Services raises the following issues on appeal: 1) whether the Trial Court erred in upholding denial of Knowledge Services' bid protest for failure to file sufficient bond under Tenn. Code Ann. § 12-3-514(d); and 2) whether the Trial Court erred in denying Knowledge Services' motion to supplement the record.

In *Leonard Plating Company v. Metropolitan Government of Nashville and Davidson County*, we discussed the limited and deferential standard applied to decisions reviewed under a common law writ of certiorari as follows:

The scope of review afforded by a common-law writ of certiorari is extremely limited. Reviewing courts may grant relief only when the board or agency whose decision is being reviewed has exceeded its jurisdiction or has acted illegally, arbitrarily, or fraudulently.

Review under a common-law writ of certiorari does not extend to a redetermination of the facts found by the board or agency whose decision is being reviewed. The courts may not (1) inquire into the intrinsic correctness of the decision, (2) reweigh the evidence, or (3) substitute their judgment for that of the board or agency. However, they may review the record solely to determine whether it contains any material evidence to support the decision because a decision without evidentiary support is an arbitrary one.

Ascertaining whether the record contains material evidence to support the board's or agency's decision is a question of law. For the purpose of this inquiry, "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. The amount of material evidence required to support a board's or agency's decision must exceed a scintilla of evidence but may be less than a preponderance of the evidence.

*Leonard Plating Co. v. Metropolitan Gov't of Nashville and Davidson Cnty.*, 213 S.W.3d 898, 903-04 (Tenn. Ct. App. 2006) (internal citations and footnotes omitted).

An issue on appeal concerns statutory interpretation. As our Supreme Court has instructed:

Issues of statutory construction present questions of law that we review de novo with no presumption of correctness. *Martin v. Powers*, 505 S.W.3d 512, 518 (Tenn. 2016). The primary goal of statutory interpretation is to carry out legislative intent without expanding or restricting the intended scope of the statute. *State v. Smith*, 484 S.W.3d 393, 403 (Tenn. 2016) (citations omitted). In determining legislative intent, we first must look to the text of the statute and give the words of the statute "their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012) (citations omitted). When a statute's language is clear and unambiguous, we enforce the statute as written; we need not consider other sources of information. *Frazier v. State*, 495 S.W.3d 246, 249 (Tenn. 2016). We apply the plain meaning of a statute's words in normal and accepted

-10-

usage without a forced interpretation. *Baker v. State*, 417 S.W.3d 428, 433 (Tenn. 2013). We do not alter or amend statutes or substitute our policy judgment for that of the Legislature. *Armbrister v. Armbrister*, 414 S.W.3d 685, 704 (Tenn. 2013).

*Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018).

We first address whether the Trial Court erred in upholding denial of Knowledge Services' bid protest for failure to file sufficient bond under Tenn. Code Ann. § 12-3-514(d). In its brief, Knowledge Services argues that its protest bond should have been calculated based upon 5% of the lowest evaluated cost proposal rather than a straightforward 5% of the State's estimated maximum liability. Knowledge Services observes that subsection (d)(1) does not include the words "for fixed cost contracts only" and (d)(2) likewise does not state "only for contracts where the actual cost may vary over the contract term" or "for statewide contracts only." Knowledge Services notes that (d)(3) and (d)(4) plainly apply to revenue and no-cost contracts respectively, but no similar distinction is made between subsections (d)(1) and (d)(2). According to Knowledge Services, "[i]f a protest is filed and the RFP contained a lowest evaluated cost proposal, the protest bond should be calculated based on the lowest evaluated cost proposal as expressly stated in (d)(1). If a protest is filed and the RFP did not contain a lowest evaluated cost proposal, the bond can and must be calculated based on maximum or estimated maximum liability as set forth in (d)(2)." Knowledge Services notes further that prior to the 2015 amendment to the bid protest statute, the only way to calculate a post-award protest bond was "5% of lowest cost proposal evaluated." Knowledge Services argues that the RFP in the instant case contained a lowest evaluated cost proposal, thus (d)(1) offers the appropriate formula for calculating the protest bond. Namely, the RFP contained "a multi-step evaluation process that converted the percentage mark-up to a dollar amount, thereby resolving any question about how and whether the bond can be calculated." Finally, Knowledge Services argues that the protest bond is meant to protect the State from frivolous bid protests, not to ensure full performance of the contract.

In response, the Committee argues "both Subsections (d)(1) and (d)(2) apply to cost type contracts, with each involving a different scenario. Subsection (d)(1) applies to contract solicitations where the State's maximum costs are set. Subsection (d)(2) applies to contracts where the State's costs are not known, and there is thus an estimated maximum liability." The Committee argues further that Knowledge Services wrongly equates "lowest cost proposal" with management fees by basing its protest bond amount on the maximum management fees that an awardee can receive under the contract. The Committee argues that subsections (d)(1) and (d)(2) are predicated on the State's costs rather than a contractor's revenue. In addition, the Committee submits that "the

-11-

management fee itself does not represent what the cost to the State will be over the life of the contract." For its part, Covendis argues that Knowledge Services ignores the State's actual costs under the contract. Covendis notes that "the vendor will be responsible for the delivery of contingent workforce services for the State. The vendor will be liable for the failure in performance. That liability does not pass through to the subvendors, but is retained by the prime contractor. Under this contract, the prime contractor will not receive payments limited to its MSP Fee but approximately $50 million annually from the State of Tennessee."

This issue requires us to construe Tenn. Code Ann. § 12-3-514(d). We begin by considering the statute's overall purpose. A protest bond does not inure to the benefit of the disappointed bidder; on the contrary, it is an obstacle to the disappointed bidder, as Knowledge Services has experienced. Knowledge Services points out that few states impose any kind of protest bond requirement. We are left to conclude that Tenn. Code Ann. § 12-3-514, which imposes an obstacle for disappointed bidders, is intended to protect the State.

Knowledge Services argues nevertheless that Tenn. Code Ann. § 12-3-514 is meant only to deter frivolous protests, not secure full performance of the contract. While deterring frivolous bid protests surely is an intended purpose of the statute, the issue is how to calculate the amount that will deter a frivolous bid. The statute's overall intent is to protect the State. Basing the amount on a bidder's proposed cost without heed to the State's actual exposure on the contract is not a reasonable interpretation in light of the purpose of the statute. Tenn. Code Ann. § 12-3-514(d) offers four distinct methods of calculating a protest bond amount. Each of these methods corresponds to a different type of contract. In order to effectuate the evident purpose of the statute, the proper method to apply in a given case will be the one that addresses the State's exposure under the proposed contract. In other words, the four distinct methods created by the 2015 amendment provide four separate ways of protecting the State depending on the type of contract at issue. The correct subsection to apply will depend on how much cost the State may incur under the RFP. Again, the perspective is that of the State, not the disappointed bidder. This is in keeping with the Tennessee Supreme Court's instruction that we are to "give the words of the statute 'their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose.' " *Coleman*, 551 S.W.3d at 694 (quoting *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012)).

In the present case, the CPO applied subsection (d)(2), with its grounding in the State's estimated maximum liability. Under the RFP, the State's estimated maximum liability is $190,000,000. Applying subsection (d)(2) yields a protest bond amount of $9,500,000. The $71,250 bond submitted by Knowledge Services is grossly

-12-

disproportionate to the State's estimated maximum liability. The fee relied upon by Knowledge Services as the basis for its own calculation of the protest bond is but one portion of the State's liability in this matter. Thus, the CPO's application of Tenn. Code Ann. § 12-3-514(d)(2) was in keeping with the statute's purpose as it protects the State based on its actual exposure. We further construe Tenn. Code Ann. § 12-3-514 to mean that it is the CPO, rather than the disappointed bidder, that determines the protest bond amount in the first instance. Otherwise, Tenn. Code Ann. § 12-3-514(d) would constitute a menu from which a disappointed bidder could choose the most advantageous subsection to calculate a protest bond. That is contrary to the statute's evident purpose, which is to protect the State.

On common law writ of certiorari review, we are confined to inquiring into whether the board or agency at issue exceeded its jurisdiction or acted illegally, arbitrarily, or fraudulently. It is a narrow review. In the instant case, the CPO applied Tenn. Code Ann. § 12-3-514(d)(2) to calculate the amount of the protest bond. Knowledge Services failed to post the necessary protest bond of $9,500,000 and its protest was dismissed as a result. Knowledge Services then appealed to the Committee, which denied the appeal upon a hearing. At no stage was the law misapplied. The Committee did not exceed its jurisdiction or act illegally, arbitrarily, or fraudulently in denying Knowledge Services' appeal of the CPO's decision. We affirm the judgment of the Trial Court dismissing Knowledge Services' amended petition for common law writ of certiorari.

The second and final issue we address is whether the Trial Court erred in denying Knowledge Services' motion to supplement the record. Knowledge Services argues that it should have been permitted to put on proof in the Trial Court of the Credential RFP and the 2013 RFP to show that the Committee acted arbitrarily in denying its appeal. Regarding whether and when additional evidence may be introduced in connection with judicial review under the common law writ of certiorari, this Court has stated:

> [J]udicial review under a common-law writ of certiorari is typically limited to the record made before the board or agency. *See Jeffries*, 108 S.W.3d 862 at 873. However, "the trial court **may** permit the introduction of additional evidence on the issue of whether the board or agency exceeded its jurisdiction[ ] or acted illegally, capriciously, or arbitrarily." *Adams v. Tenn. Dep't of Corr.*, No. M2013-00370-COA-R3-CV, 2014 WL 4536557, at *3 (Tenn. Ct. App. Sept. 11, 2014) (emphasis added) (citing *Hunter v. Metro. Bd. of Zoning Appeals*, No. M2002-00752-COA-R3-CV, 2004 WL 315060, *2 (Tenn. Ct. App. Feb. 17, 2004)); *see also Cooper v. Williamson Cnty. Bd. of Educ.*, 746 S.W.2d 176, 179 (Tenn. 1987); *Davison v. Carr*, 659 S.W.2d 361, 363 (Tenn. 1983). Thus, we review the trial court's discovery decisions

on appeal for an abuse of discretion. *Johnston v. Metro. Gov't of Nashville & Davidson Cnty.*, 320 S.W.3d 299, 315 (Tenn. Ct. App. 2009) (citing *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 600 (Tenn. Ct. App. 2007)).

*Hanley v. Turney Ctr. Disciplinary Bd.*, No. M2016-01223-COA-R3-CV, 2016 WL 6995481, at *5 (Tenn. Ct. App. Nov. 30, 2016), *Rule 11 perm. app. denied Mar. 9, 2017*.

Knowledge Services argues that by adopting common law writ of certiorari review, the bid protest statute also adopts the jurisprudence surrounding the common law writ of certiorari including the ability to introduce additional evidence that goes to whether the board or agency exceeded its jurisdiction or acted illegally, capriciously, or arbitrarily. The State and Covendis disagree, pointing to the language of Tenn. Code Ann. § 12-3-514(l) that "[t]he scope of review in the proceedings shall be limited to the record made before the protest committee…." However, this language merely restates the common law writ of certiorari scope of review under which review is typically limited to the record before the board or agency. *See Emory v. Memphis City Schools Bd. of Educ.*, 514 S.W.3d 129, 140 (Tenn. 2017) (internal citations, brackets and quotation marks omitted) ("Generally, the scope of review for a common-law writ of certiorari (intended to address legality) is limited to the record to determine as a question of law whether there is any material evidence to support the agency's findings, but new evidence could be admitted on the issue of whether the administrative body exceeded its jurisdiction or acted illegally, capriciously, or arbitrarily"). That, in turn, is consistent with the well-recognized exception that additional evidence may be introduced regarding whether the board or agency exceeded its jurisdiction or acted illegally, capriciously, or arbitrarily. *See Moore v. Metro. Bd. of Zoning Appeals*, 205 S.W.3d 429, 435 (Tenn. Ct. App. 2006) (citations omitted) ("Judicial review under a common-law writ of certiorari is limited to the record made before the board or agency unless the court has permitted the introduction of additional evidence on the issue of whether the board or agency exceeded its jurisdiction or acted illegally, capriciously, or arbitrarily"). Tenn. Code Ann. § 12-3-514(l) does not carve off this longstanding aspect of common law writ of certiorari jurisprudence (i.e., does not state that no additional evidence may be introduced ever). It merely uses the default language associated with the common law writ of certiorari that review is limited to the record of the board or agency. Tenn. Code Ann. § 12-3-514(l) does not preclude a party from introducing additional evidence for the limited purpose of showing that the Committee exceeded its jurisdiction or acted illegally, capriciously, or arbitrarily. It is not, however, a chance to relitigate the Committee's substantive decision.

Nevertheless, a party is not necessarily entitled to put on this additional evidence. A trial court's decision on whether to admit the additional evidence is subject to abuse of discretion review. Our Supreme Court has articulated the abuse of discretion standard of

review as follows:

> This Court has described the abuse of discretion standard in some detail:

> > The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below, or to substitute their discretion for the lower court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

> > Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

> *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted); *see also BIF, a Div. of Gen. Signals Controls, Inc. v. Serv. Const. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988) (citations omitted) ("The standard conveys two notions. First, it indicates that the trial court has the authority to choose among several legally permissible, sometimes even conflicting, answers. Second, it indicates that the appellate court will not interfere with the trial court's decision simply because it did not choose the alternative the appellate court would have chosen.").

> *Lee Medical* provided the framework for determining whether a trial court has properly exercised its discretion:

> > To avoid result-oriented decisions or seemingly

irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Lee Med.*, 312 S.W.3d at 524-25 (citing *Flautt & Mann v. Council of City of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF*, 1988 WL 72409, at *3)); s*ee also Vodafone Americas Holdings, Inc. & Subsidiaries v. Roberts*, 486 S.W.3d 496, 514 (Tenn. 2016).

*Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020).

The Trial Court found that Knowledge Services' supplemental evidence was irrelevant, stating "the 2013 solicitation (which is the predecessor contract to the current RFP) pre-dated the current version of the bid protest statute at issue here, establishing the amount of the protest bond based on the type of contract solicited. The 2019 solicitation involved a different type of contract that was not based on the State's 'estimated liability' under the contract." The Trial Court further found that Knowledge Services could have introduced these pieces of evidence before the Committee but failed to do so. These conclusions by the Trial Court are rational and supported by the record. Ultimately, the issue presented on appeal is a question of law—that is, the interpretation of Tenn. Code Ann. § 12-3-514. The supplemental evidence Knowledge Services sought to introduce concerning the CPO's past practices would not assist our interpretation of Tenn. Code Ann. § 12-3-514, with its plain language and evident purpose.

We conclude that the Trial Court, in denying Knowledge Services' motion to supplement the record, did not apply an incorrect legal standard; did not reach an illogical or unjust decision; and did not make a clearly erroneous assessment of the evidence. In addition, the Trial Court's decision had a factual basis; properly identified and applied the most appropriate legal principles applicable to the decision; and was within the range of acceptable alternative dispositions. No injustice was done toward Knowledge Services. In short, the Trial Court did not abuse its discretion in denying Knowledge Services' motion to supplement the record. We affirm the judgment of the Trial Court.

-16-

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Guidesoft, Inc. d/b/a/ Knowledge Services, and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE