FILED

11/20/2025

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 1, 2025

## GOODWILL INDUSTRIES OF TENNEVA AREA, INC., ET AL. v. MICHAEL HUTTON

**Appeal from the Chancery Court for Sullivan County**
**No. 24-CB-28508   Katherine Priester, Chancellor**

———————————————————

### No. E2024-01171-COA-R3-CV

———————————————————

The appellees filed a petition for a temporary restraining order and an injunction, pursuant to the Tennessee Violence in the Workplace Act, Tenn. Code Ann. § 20-14-101, *et seq.* ("the TVWA"), against a former employee, the appellant. The appellees alleged, *inter alia*, that the appellant was committing unlawful violence at the workplace by stalking the corporation, the chief executive officer ("CEO"), and the employees. The alleged stalking consisted mostly of public Facebook posts by the appellant. The Chancery Court for Sullivan County ("the Trial Court") granted the appellees a temporary restraining order prior to the hearing on the injunction. After the hearing, the Trial Court found that the appellant had committed unlawful violence at the workplace via stalking based upon the appellant's persistent Facebook posts about the appellees and granted the appellees an injunction against the appellant. The Trial Court also found the appellant in contempt for eleven violations of the temporary restraining order. The Trial Court awarded the appellees their attorney's fees. This appeal ensued. Based upon our review, we reverse the Trial Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY W. ARMSTRONG, JJ., joined.

Michael D. Hutton, Bristol, Tennessee, Pro Se.

Jimmie C. Miller and Joseph B. Harvey, Kingsport, Tennessee, for the appellees, Goodwill Industries of Tenneva Area, Inc., and Morris Baker.

## OPINION

## Background

On March 8, 2024, Goodwill Industries of Tenneva Area, Inc. ("Goodwill"); its employees and agents; and Morris Baker, Goodwill's CEO ("Baker") (collectively, "Petitioners"), filed a complaint and petition for a temporary restraining order and injunctive relief against a former Goodwill employee, Michael Douglas Hutton ("Hutton"). Petitioners alleged that Hutton had made a credible threat of violence under the TVWA and committed stalking pursuant to Tenn. Code Ann. § 39-17-315. According to Petitioners, Hutton had worked at Goodwill from April 2019 to February 2022, when his employment was terminated based on his alleged inappropriate conduct towards certain female employees.

Over a year after his termination, on May 8, 2023, Hutton was involved in a dispute with a Goodwill employee at the Goodwill store located on W. State Street ("State Street store"), and he was asked to leave. Goodwill employees were concerned Hutton would return to the store, and as a result, Goodwill hired security for the store and sent Hutton a letter asking him not to return to any Goodwill location. In June 2023, Goodwill's counsel sent another letter to Hutton advising him that he was banned from Goodwill's premises and informing him that his presence would be treated as criminal trespass. Hutton then allegedly began a campaign of harassing and threatening behavior directed toward Goodwill, its employees, its counsel, and Baker. Petitioners' complaint consisted mostly of Hutton's confrontational Facebook posts regarding Goodwill and Baker. They requested a temporary restraining order against Hutton and a hearing on further injunctive relief.

Baker separately filed a petition for an order of protection against Hutton, alleging that Hutton was stalking him, pursuant to the TVWA and Tenn. Code Ann. § 39-17-315(h). Baker's allegations mirrored Petitioners' allegations in their complaint. The Trial Court entered an *ex parte* temporary order of protection in favor of Baker against Hutton and extended this order three times.

On March 15, 2024, Petitioners filed a motion for temporary and permanent injunction, pursuant to Tennessee Rule of Civil Procedure 65.04 and the TVWA, alleging that Hutton's social media posts and direct communications had become increasingly threatening, confrontational, and personal, expressing concern for how Hutton would escalate the situation.

The Trial Court entered an *ex parte* temporary restraining order on March 22, 2024. The Trial Court prohibited Hutton from the following actions:

1. Contacting Goodwill and/or its employees, including but not limited to Morris Baker, Caitlin Wheeler, Melissa Clark, and/or Kimberly Leonard, by telephone, email, messages, text messages, social media, or any other type of communication or contact electronic communications, social media posts, social networking communications, or any other media.

2. Coming within 500 feet of any Goodwill business location, including, but not limited to, the State Street Store located at 2691 W. State Street, Bristol, TN 37620, and Goodwill's corporate office located at 200 East Main St., Kingsport, Tennessee 37660-6637.

3. Coming within 500 feet of Morris Baker, Caitlin Wheeler, Melissa Clark, and/or Kimberly Leonard.

4. Making posts on social media that are threatening, intimidating, harassing, and/or defamatory regarding Goodwill and/or its employees, including but not limited to Morris Baker, Caitlin Wheeler, Melissa Clark, and/or Kimberly Leonard.

On April 16, 2024, Petitioners filed a motion for contempt alleging that Hutton had violated the Trial Court's temporary order of protection in favor of Baker and the Trial Court's temporary restraining order in favor of Petitioners. Petitioners alleged that Hutton continued to make harassing, threatening, and disparaging Facebook posts about Petitioners.

Hutton filed a response to the complaint and petition, arguing that he had threatened only litigation. He alleged that he had never threatened bodily harm to anyone at Goodwill. He also argued that the TVWA was inapplicable because he never engaged in harassing or threatening behavior at the workplace.

On April 22, 2024, the Trial Court entered a new temporary restraining order nearly identical to the *ex parte* temporary restraining order. However, instead of a prohibition on Hutton's presence within 500 feet of any Goodwill location, Goodwill employee, and Baker, the Trial Court narrowed this prohibition to 100 feet.

Trial was held on May 7, 8, and 15, 2024. Petitioners' petition for injunctive relief and Baker's petition for an order of protection were consolidated at the start of trial. Based on the testimony, the conflict between Hutton and Petitioners began in May 2023, when Hutton received a phone call from Melissa Clark ("Clark"), an assistant manager at the State Street store. According to Hutton's testimony, Clark informed him that Caitlin Wheeler ("Wheeler"), another Goodwill employee, had told her that Hutton threatened to kill Wheeler's sister and family after Wheeler's sister and Hutton had a "business fallout."

- 3 -

A few days later on May 8, Hutton was shopping in the State Street store when he noticed an "assistant team lead," Kimberly Leonard ("Leonard"), and Wheeler talking and pointing at him. This led Hutton to ask the cashier if he could speak to the manager. Leonard approached Hutton, and Hutton informed her that his falling out with Wheeler's sister had nothing to do with Goodwill and that it was unprofessional for her to "bring it into Goodwill." On his way out of Goodwill, he told Leonard that if something like that happened again, he would inform Baker. He denied that he was ever asked to leave the store.

Leonard also testified about the May 8 interaction, stating:

I went down to speak with him and he immediately went in with a barrage of questions. He accused me of talking about him, he knew that we were all talking about him. He told me -- and I was trying -- during all this trying to explain, you know, I don't know what you're talking about. We were not talking about you but I was having -- in the midst of trying to explain that, you know, I'm getting talked over. And he did tell me that I needed to respect him. He demanded my respect. He would get my respect by any means necessary.

She testified that Hutton had screamed at her and that she could feel his breath on her face. When cross-examined by Hutton, Leonard testified: "[Y]ou were standing in my face screaming at me, pointing at me when you said it. I felt extremely threatened by you." She testified that Hutton seemed angry, that he had cussed at her, that no one had ever talked to her like that before, and that she felt scared.

Leonard said she continued to be concerned for her safety ever since the incident. She testified that she was worried he would physically retaliate against her. After this incident, Leonard could not sleep and was up all night. In response to the incident, Goodwill hired security. Leonard testified that if Hutton were allowed to return to the State Street store, she would quit.

Clark testified that she spoke to Hutton over the phone after his confrontation with Leonard. According to Clark, Hutton stated that he deserved respect from Leonard, and he told Clark that she needed to "get better control of her." She also testified that Hutton had told her that he was going to send his girlfriend to "kick [Leonard's] ass." Hutton told Clark that he was just getting started. Like Leonard, Clark testified that she was concerned for her safety and that she would no longer work for Goodwill if Hutton were allowed to return to the State Street store.

At trial, Clark was also asked about a Facebook post Hutton had "tagged" her in. The post read:

- 4 -

> So since Goodwill opted for a lawsuit for defamation of character, slander/libel and discrimination, here's the question of the day:
>
> Is Morris Baker/Goodwill Industries of Tenneva Area going to provide counsel for their co-defendants Caitlin Wheeler (who started this entire farce) and Melissa A. Clark/Kimberly Leonard (who continued it's malicious spread), or are they going to make them retain their own counsel at their own expense?
>
> Asking for a friend . . .

Clark testified that she interpreted this Facebook post as a threat. She explained that she is concerned that Hutton will file a lawsuit against her.

> When asked by Petitioners' counsel if she was concerned about the hearing that day, Clark testified:
>
> Yeah, absolutely. . . . after everything that we have gone through, you know, Michael and our friendship and seeing everything that he has posted, he is -- that I've seen him do, which I've not seen him with confrontation between him and Kim, but I felt that because Michael has always been . . . hot-headed, intimidating, forceful in his words. He scares me. He just scares me.

When asked by Hutton to elaborate why she was concerned, Clark stated:

> You are so disrespectful. You are mean. You are -- try to be intimidated. You use your words loosely. You don't care who they hurt, how they hurt them. We've been friends a long time but that went out the door because of your words, not mine. That went out the door because you have been disrespectful to everybody. You have no concern for anyone's welfare, their regards for their feelings or anything else. And yes, you have intimidated me by your words, by your Facebook posts, by the things that you have done, you have said, your proven acts of your responsibility.

Baker testified that he interpreted at least some of Hutton's Facebook posts as threats of physical violence. When asked by Hutton how he became aware of his Facebook posts, Baker explained: "I'll stipulate most of these posts I had somebody show them to me." When asked about a specific post, Baker testified: "I had somebody show me this post. . . . As I did all of these posts." Matt Delozier, the Vice President of People Operations at Goodwill, likewise testified: "[W]hen these posts were flying around over the course of a year anytime somebody saw something they thought was interesting they

would make sure that I got a text that said, hey, there's a post or they would bring me a post and show it to me or whatever."

Petitioners' counsel asked Baker about this specific Facebook post by Hutton:

So I have a general, yet kinda legal, question:

What kind of weak-kneed, no-backbone "corporate attorney" claims one day that you're just trying to intimidate them, and the next day blocks you from trying to resolve a dispute amicably outside of a federal lawsuit filing?

I guess the old saying "f*** around and find out" comes into play here.

Goodwill Industries of Tenneva Area, I'm coming for you. HARD! And you best up the ante. Your attorney is just about as garbage as you are and I'll destroy you both. Single-handidly. Period!

Gonna start making press calls today. I'll make sure every local news outlet - WCYB, WJHL, Johnson City Press, Bristol Herald Courier, Kingsport Times-News, and The Greeneville Sun - knows the EXACT time and day of my federal filing in Greeneville, TN.

I will DESTROY what little credibility that Goodwill has left in the community.

And to all my Goodwill friends - y'all might want to start looking for alternate employment arrangements.

The following interaction between Petitioners' counsel and Baker highlights Baker's interpretation of and feelings about Hutton's Facebook posts:

Q. . . . From your perspective as the CEO of Goodwill when he's telling his Goodwill friends they better find another job, what did that convey to you as the CEO of Goodwill?

A. It told me I had a threat.

* * *

A. So the third paragraph, the first one there highlighted gave me concern for a physical threat, 'I'm coming at you hard.' 'I'm going to destroy you both.' And then the last one gave me a threat that Mr. Hutton was going to

- 6 -

try to sabotage our organization and shut it down and -- and unemploy 310 employees.

Q. There's been a lot of talk about questions regarding whether all this was about civil litigation. Did you hire security officers because you were concerned that you might be -- that Goodwill would be sued civilly?

A. No, ma'am.

Q. Did you have -- retain Mr. Harvey because you were worried about a civil suit?

A. No, ma'am.

A. Page 22. This is a post on February 15. When Mr. Hutton posted, "better call 9-1-1," what concern did that give you, Mr. Baker, as the CEO of Goodwill?

A. So as the CEO I knew this sign was not one at our location but I also knew as CEO my concern is for my employees. They did not know that, some of them. So when I saw, "better call 9-1-1," that led me to believe that there could be a physical -- physical -- that there -- that there was a threat of physical violence or there would be injury at our stores.

\* \* \*

Q. If you'd look at Page 23. This one names you individually, does it not?

A. He tagged me in that post and right after he tagged me in that post I went in -- and I was watching I think a March Madness basketball game or college basketball game. When I saw it I went in and blocked and untagged myself and there was a post that came right after that that is not in here but it was -- it -- I know the initial -- I did not read this post that night. When I saw, "Your time is up, Morris Baker. You messed with the bull, now it's time to get the horns," that's when I untagged myself. It was this post I had some friends and colleagues call me that night. My wife saw the post that night and that's when she expressed her concern for me.

Q. And, Mr. Baker, in addition to being concerned for your employees, as the -- as these posts continued did you become concerned about your own safety?

A. I did when I became concerned for my safety and for my family's safety.

Q. Looking at Page 26 of Exhibit 4. As Mr. Hutton in this post compares you and a neutered animal and refers to you as the Chief Egotistical Officer, did that do anything to lessen your concern about your safety with -- insofar as what Mr. Hutton . . .

A. No, ma'am.

Hutton testified that his Facebook posts merely referred to a figurative fight between Petitioners and himself and that his posts were in reference to civil litigation.

The Trial Court granted Petitioners a three-year injunction prohibiting Hutton's contact and social media posts. The Trial Court analyzed whether Hutton had engaged in "unlawful violence," specifically stalking, pursuant to Tenn. Code Ann. § 20-14-101(4) and § 39-17-315(a)(4). The Trial Court explained:

> The Petitioner in Civil Action No. 24-CB-28508, the Petition for Temporary Restraining Order and Injunctive relief case, is Goodwill Industries of Tenneva Area, Inc., its Employees and Agents, including Morris Baker, CEO (hereinafter referred to as "Petitioners"). Accordingly, the Court in this case must consider whether the Respondent engaged in a willful course of conduct involving repeated or continuing harassment of Petitioners that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed or molested and that actually caused Petitioners to feel terrorized, frightened, intimidated, threatened, harassed or molested.[1] In determining whether the Respondent engaged in a "course of conduct" the Court must consider whether the Respondent engaged in a pattern of conduct composed of a series of two (2) or more separate, noncontinuous acts evidencing a continuity of purpose.
>
> Finally, the Court must determine whether the Respondent's actions constitute "harassment" pursuant to Tennessee law. In doing so, the Court must look at Respondent's conduct directed towards Petitioners to determine whether it is repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually caused Petitioners to suffer emotional distress.

(Original footnote included but renumbered.)

The Trial Court made the following findings of fact to support its conclusion that Hutton had committed "unlawful violence" via stalking:

---

[1] See Tenn. Code Ann. § 39-17-315(a)(4).

- Goodwill terminated Hutton's employment in 2022.

- On May 8, 2023, Hutton went to the State Street store "where there was an incident with an employee," Kimberly Leonard.  Hutton was asked to leave the store.

- In early June 2023, counsel for Goodwill sent a formal letter to Hutton banning him from that Goodwill location.

- On June 15, 2023, Hutton made the following post on Facebook:

  I see you Goodwill Industries of Tenneva Area.  And as they say in the Corps, back blast area all secure!

  To my TRUE friends from my Goodwill days, brace for impact.

  There's a reason why it is said that a Marine is "no better friend, no worse enemy".  And let's just say the battle has begun!

- On June 26, 2023, Hutton posted a picture of the entrance of the State Street store location with the following caption: "At Sonic enjoying a shake wondering where Goodwill's 'security' is at this afternoon."  The photo accompanied the following Facebook post:

  Here's a thought:

  If you spent as much time minding your own business instead of worrying about my every move, and not trying to cover up your corrupt ways, maybe you wouldn't have to waste additional NON-PROFIT money on added "security" in the form of a posted Sheriff's Deputy at your establishment.

  I told you, I'm not the one.  But I assure you, my actions won't be directed at any individual at the store level.  I'm coming after your corrupt, corporate head.  Take that back to your corporate lawyer, because I promise you it's a check I WILL cash!

  I WILL let the public know how you're soliciting donations for "Veteran's services" yet you treat a Veteran (myself) the way you have over the past 16 months.  You CANNOT and WILL NOT silence the truth!  You WILL be held liable for your actions!  Any questions or inquiries can be directed to me via comment or DM.  I'd LOVE to tell #MyStory

Johnson City Press
Kingsport Times-News
Bristol Herald Courier
WCYB
WJHL
Goodwill Industries International

- On August 23, 2023, Hutton made the following Facebook post:

  Goodwill Industries of Tenneva Area has elected to play hard ball.

  Stand by, grab hold.

  Prepare for impact.

  S/f

- On August 24, 2023, he made this Facebook post:

  Goodwill Industries of Tenneva Area is about to be taught a lesson on respect. Furthermore, their continuous slander regarding me is about to be adjudicated civily.

  Through counsel, they offered to lift their current ban, with certain restrictions, in January 2024.

  If your original claims are meritless and without cause, do you really think I'd accept somewhat of an "Alford plea"?

  More info to follow. This dog and pony show is just getting started!

  Preston Ayres WCYB Jeremy Eisenzopf WJHL KevinCastle Bristol Herald Courier Joe Avento, JC Press and Kingsport Times News

- On October 10, 2023, Hutton made the following post:

  F*ck Goodwill Industries of Tenneva Area.

  Yea I said it.

  Sue me.

- 10 -

Please.

If it was up to me, anyone with half a brain would feel the same, refuse to donate, and refuse to shop.

Ain't nothing but a bunch of greedy crooks.

Again, PLEASE sue me!

#ISaidWhatISaid

- On January 30, 2024, Hutton posted the following:

I'm sure John Hopkins' attorneys had them convinced that the Kowalski's didn't have a "viable lawsuit" as well.

Sometimes ill advice from a loose-lipped "corporate attorney" will get your ass burned.

I swear, you wouldn't think it would be so hard to do the right thing. Guess you're gonna talk yourself into a lawsuit Goodwill Industries of Tenneva Area.

- On February 1, 2024, he made this post:

So I have a general, yet kinda legal, question:

What kind of weak-kneed, no-backbone "corporate attorney" claims one day that you're just trying to intimidate them, and the next day blocks you from trying to resolve a dispute amicably outside of a federal lawsuit filing?

I guess the old saying "f*** around and find out" comes into play here.

Goodwill Industries of Tenneva Area, I'm coming for you. HARD! And you best up the ante. Your attorney is just about as garbage as you are and I'll destroy you both. Single-handidly. Period!

Gonna start making press calls today. I'll make sure every local news outlet - WCYB, WJHL, Johnson City Press, Bristol Herald Courier, Kingsport Times-News, and The Greeneville Sun - knows the EXACT time and day of my federal filing in Greeneville, TN.

I will DESTROY what little credibility that Goodwill has left in the

community. And to all my Goodwill friends - y'all might want to start looking for alternate employment arrangements.

- On February 7, 2024, Hutton posted:

  A lot of inquiring minds have asked about my ongoing dispute with Goodwill Industries of Tenneva Area.

  Currently, I have given them a deadline of Friday, February 23rd to rescind the discriminatory and unjust ban against myself and Kathryn [Hutton's girlfriend]. If they refuse, as I'm certain they will, I will take the next steps of filing a federal lawsuit against them.

  When you have incompetent counsel defending you, they will talk you straight into a lawsuit, as is the case here. And as I've said before, I'm certain that all the latest defendants in civil litigation cases advised their clients that "valid grounds for a viable lawsuit" did not exist, yet two specific cases netted nearly $300 million in damages. How did that work out for them?

  I read today on a friend's profile that "what you . . . allow is what will continue". They certainly picked the wrong one. I WILL NOT stand for injustice and discrimination of ANY type - I don't care who you are. No one is above the law.

- On February 15, 2024, he posted a photo of a sign at a Goodwill location with the following caption:

  Someone better tell that "Chief Energy Officer" (dumbass) Morris I'm at Goodwill.

  Better call 9-11 since, as Kathryn pointed out, he's got a hard-on for me! Might knock someone dead with these sexy looks[.]

- On February 23, 2024, Hutton made the following posts on Facebook:

  Your time is up Morris Baker. You messed with the bull, now it's time to get the horns. I will DESTROY your corrupt ass. If I'll take a judge to state Supreme Court and take on an entire city, do you really think I won't come after you?

  Unlike you, it was instilled in me by my grandparents as a child to treat others as you would like to be treated. Furthermore, I was taught that

respect is EARNED, and that your title or status doesn't equate to respect being given automatically by those under your charge.

You claim to be a "Christian", but it seems to me that you offer nothing but lip service - a wolf in sheep's clothing.  Paul told us to be doers of the word.  It's people like you, with self-entitled egos, who place a bad taste in the mouth of a lost individual about Christianity.

I've given you AT LEAST six amnesty periods (grace), and you have chosen to spit in my face each and every time.  Now, I'm going to be the worst publicity nightmare you ever dreamed possible.  When I'm done with you, you'll wish that you had never chosen to mess with me.  I'll SHOW you exactly why they say that a Marine is "no better friend, no worse enemy".

It's very unfortunate that Kathryn tried to alter my opinion of you long ago, but I was blinded by the falseness you spewed.  She saw right through your charade, and saw you for exactly who you are - a two-faced, greater than thou backstabber who only has his own self-interests at heart.  She saw you as the sleaze ball that you truly are.

If you want to silence me Morris, you have two options: Do something about it, which we both know you don't have the backbone or intestinal fortitude to do, OR do the right thing and fix this, which we both know your pride won't allow you to do.  Guess you're stuck with option three: Get TAUGHT respect like your mother should have done with you as a child!

Your ignorant, insolent, prideful ass could have avoided this. Your "corporate attorney" surmizing that you can't stop me from filing a lawsuit is the most ignorant piece of advice you could cling to.  I have given you plenty of chances to swallow your egotistical pride, apologize and rescind your discriminatory ban towards Kathryn and I, thereby absolving this situation.  Now you WILL pay.  You've allowed your moronic, loose-lipped "attorney" to talk you straight into a lawsuit that should have been avoided. Congratulations!  You're just as ignorant as I thought you to be.

You're going to actually cause me to waste my time and effort into researching case laws involving discrimination, slander and libel, and defamation of character.  You best believe I'll make you dig deep in those corrupt pockets.  Remember, you chose this!

See you in court!!

\* \* \*

Anyone know what a neutered animal and Morris Baker, "Chief Egotistical Officer" of Goodwill Tenneva, have in common?

NEITHER have balls!

\* \* \*

I took Morris Baker to a shooting range.

Poor bastard didn't know which direction to run in.

(I got jokes all day).

- On February 23, 2024, Hutton sent a direct message to an employee named Elizabeth threatening litigation and informing her that she and four dozen other past and present Goodwill employees would be on his witness list against Goodwill.

- On March 1, 2024, Hutton posted:

So since Goodwill opted for a lawsuit for defamation of character, slander/libel and discrimination, here's the question of the day:

Is Morris Baker/Goodwill Industries of Tenneva Area going to provide counsel for their co-defendants Caitlin Wheeler (who started this entire farce) and Melissa A. Clark/Kimberly Leonard (who continued it's malicious spread), or are they going to make them retain their own counsel at their own expense?

Asking for a friend . . .

Based on these findings, the Trial Court concluded that an injunction was necessary to prevent Hutton's "harassing and vexatious comments" on social media as well as his "continued and repeated threats of litigation." The Trial Court specifically found that Hutton's social media comments threatening litigation constituted harassment, rather than speech protected by the First Amendment. The Trial Court further stated:

Respondent's comments on social media, his direct messages to employees, correspondences and emails to counsel for Goodwill coupled with the

incident that occurred at the West State Street store on May 8, 2023, all show that the Respondent has engaged in a course of conduct of repeated and continuing harassment of the Petitioners that would cause a reasonable person to feel harassed. For the aforementioned reasons, the Court finds that the Petitioners have proven by clear and convincing evidence that the Respondent has violated the Tennessee Violence in the Workplace Act, and that Petitioners are entitled to relief.

The Trial Court granted the Petitioners an injunction, prohibiting Hutton from contacting them by telephone, email, messages, text messages, social media, or any other type of communication; coming within 100 feet of any Goodwill locations or the other petitioners; and making posts on social media that are threatening, intimidating, harassing, or defamatory about Goodwill or its employees. The Trial Court also ordered Hutton to remove any threatening, intimidating, harassing, and/or defamatory social media posts about Goodwill or its employees. The Trial Court ordered that the injunction continue in effect for three years.

The Trial Court dismissed Baker's order of protection, finding that the injunction granted pursuant to the TVWA adequately protected Baker. The Trial Court further found Hutton in contempt, concluding that he had violated the temporary restraining order eleven times between April 11 and April 14, 2024. The Trial Court granted Petitioners $3,360 in attorney's fees incurred in connection with their motion for contempt. The Trial Court also awarded Petitioners $34,239 in attorney's fees for their work related to the order of protection and the injunctive relief under the TVWA.[2] Hutton appealed.

## Discussion

We have restated and consolidated Hutton's issues into the following dispositive issues: (1) whether the Trial Court erred by granting Petitioners injunctive relief; (2) whether the Trial Court erred by finding Hutton in contempt of the temporary restraining order; and (3) whether the Trial Court erred by granting Petitioners attorney's fees.

This Court has previously explained the standard of review as follows:

> In a non-jury case, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Evidence preponderates against a finding of fact if

---

[2] Hutton filed a motion to recuse Chancellor Priester on the day of the scheduled hearing on Petitioners' petition for attorney's fees. Chancellor Priester recused herself, and Judge William K. Rogers adjudicated Petitioners' petition for attorney's fees.

the evidence "support[s] another finding of fact with greater convincing effect." We review a trial court's conclusions of law de novo with no presumption of correctness.

*City of Lebanon ex rel. Craighead v. Dodson*, No. M2016-01745-COA-R3-CV, 2018 WL 2027239, at *3 (Tenn. Ct. App. Apr. 30, 2018) (internal citations omitted).

The applicability of the TVWA, Tenn. Code Ann. § 20-14-101, *et seq.*, is at issue in this case. Tenn. Code Ann. § 20-14-102 (West eff. May 27, 2011) provides:

> Any employer or employee who has suffered unlawful violence or a credible threat of violence from any individual, or an organization that the individual is affiliated with, which can reasonably be construed to have been carried out at the workplace, may seek a temporary restraining order and an injunction prohibiting further unlawful violence or threats of violence by that individual, or the organization that individual is affiliated with, at the workplace. Nothing in this chapter shall be construed as authorizing a court to issue a temporary restraining order or injunction prohibiting speech or other activities that are protected by the constitutions of this state or the United States.

Upon filing a petition for an injunction, the petitioner may obtain a temporary restraining order if the petitioner also files an affidavit showing reasonable proof that an employer or employee has suffered unlawful violence or a credible threat of violence and that "great or irreparable harm will result" in the absence of an injunction. *Id.* § 20-14-104 (West eff. May 27, 2011). A temporary restraining order "shall remain in effect, at the court's discretion, for a period not to exceed fifteen (15) days, unless otherwise modified or terminated by the court." *Id.*

Within ten days of the filing of the petition, but in no case later than thirty days, the court shall hold a hearing on the petition for the injunction. *Id.* § 20-14-105 (West eff. May 27, 2011). The respondent may file a response that "explains, excuses, justifies, or denies the alleged unlawful violence or credible threat of violence or may file a cross-complaint." *Id.* "If the judge finds by clear and convincing evidence that the respondent engaged in unlawful violence or made a credible threat of violence, an injunction shall be issued prohibiting further unlawful violence or threats of violence at the workplace or while the employee or employer is acting within the course and scope of employment." *Id.* An injunction shall not last more than three years. *Id.*

Therefore, there are two avenues for petitioners to obtain an injunction under the TVWA: proving by clear and convincing evidence that the respondent has either (1) engaged in unlawful violence at the workplace or (2) made a credible threat of violence at the workplace. The statutory scheme defines "unlawful violence" as "assault, aggravated

- 16 -

assault, stalking, intimidation, or extortion as prohibited by §§ 39-13-101, 39-13-102, 39-17-315, 39-17-309 and 39-14-112." *Id.* § 20-14-101(4) (West eff. July 15, 2021).

Tenn. Code Ann. § 39-17-315(a)(4) (West July 1, 2023 to June 30, 2024) defines stalking as a "willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Course of conduct is defined under this statutory scheme as "a pattern of conduct composed of a series of two (2) or more separate, noncontinuous acts evidencing a continuity of purpose, including, but not limited to, acts in which the defendant directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to a person, or interferes with a person's property." *Id.* § 39-17-315(a)(1)(A).

Harassment, in turn, is defined as conduct "directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress." *Id.* § 39-17-315(a)(3). Unconsented contact means "any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued." *Id.* § 39-17-315(a)(5). Unconsented contact can mean:

> (A) Following or appearing within the sight of that person;
> (B) Approaching or confronting that person in a public place or on private property;
> (C) Appearing at that person's workplace or residence;
> (D) Entering onto or remaining on property owned, leased, or occupied by that person;
> (E) Contacting that person by telephone;
> (F) Sending to that person mail or any electronic communications, including, but not limited to, electronic mail, text messages, or any other type of electronic message sent using the internet, websites, or a social media platform; or
> (G) Placing an object on, or delivering an object to, property owned, leased, or occupied by that person[.]

*Id.* "Emotional distress" is defined as "significant mental suffering or distress." *Id.* § 39-17-315(a)(2). A showing of emotional distress does not necessarily require medical or professional treatment or counseling. *Id.*

To the extent Hutton presents an issue of statutory interpretation, we note:

Issues of statutory construction present questions of law that we review de novo with no presumption of correctness. The primary goal of statutory interpretation is to carry out legislative intent without expanding or restricting the intended scope of the statute. In determining legislative intent, we first must look to the text of the statute and give the words of the statute "their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." When a statute's language is clear and unambiguous, we enforce the statute as written; we need not consider other sources of information. We apply the plain meaning of a statute's words in normal and accepted usage without a forced interpretation. We do not alter or amend statutes or substitute our policy judgment for that of the Legislature.

*Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018) (internal citations omitted).

In arguing that the TVWA is inapplicable to this case, Hutton specifically contends that Petitioners never suffered unlawful violence which could reasonably be construed to have been carried out at Goodwill. Petitioners argue that Hutton's conduct can be construed as happening at the workplace in accordance with the TVWA for the following reasons: (1) the May 8, 2023 incident actually occurred at the State Street store; (2) Hutton's June 26, 2023 Facebook post, in which he asks where Goodwill's security is, includes a picture of the State Street store; (3) the February 15, 2024 photo taken by him at a Goodwill store, stating: "Someone better tell that 'Chief Energy Officer' (dumbass) Morris I'm at Goodwill. Better call 9-11 since, as Kathryn pointed out, he's got a hard-on for me! Might knock someone dead with these sexy looks";[3] (4) Hutton's March 25, 2024 Facebook post refers to rent-a-cops at the State Street store and gives the impression that he was watching the store; (5) Hutton's threats and harassment are directed to individuals solely because of their employment with Goodwill; and (6) Hutton contacted Baker directly and intentionally tagged three employees in a Facebook post.

One essential element to a claim for injunctive relief under the TVWA is that an employer or employee has suffered unlawful violence or a credible threat of violence "which can reasonably be construed to have been carried out at the workplace." Tenn. Code Ann. § 20-14-102. We have found only one case that cites the relevant language in Tenn. Code Ann. § 20-14-102. *See City of Lebanon ex rel. Craighead*, 2018 WL 2027239, at *4. However, *City of Lebanon ex rel. Craighead* does not elaborate on the meaning of "reasonably be construed to have been carried out at the workplace."

---

[3] At trial, Baker acknowledged that the Goodwill store referenced in the February 15, 2024 post was not one of his stores, stating: "as the CEO I knew this sign was not one at our location." We accordingly will not construe this post as having been carried out at the workplace. In any event, we find that this post would not cause a reasonable person to suffer emotional distress.

Based upon the plain language of the statute, we are unable to conclude that the vast majority of Hutton's Facebook posts could reasonably be construed as having been carried out at the workplace. We decline to interpret the phrase "at the workplace" so broadly as to include Internet posts that lack any connection to the actual location of the workplace.[4] We accordingly reject Petitioners' argument that Hutton's Facebook posts could be construed as having taken place at the workplace simply because they were directed at Goodwill or its employees. Nevertheless, at least three alleged instances of unlawful violence occurred at the workplace.

The first alleged instance of unlawful violence was the May 8, 2023 confrontation, which took place inside the store. Hutton argues that we should discount the May 8, 2023 confrontation because the security footage purportedly contradicts Leonard's testimony. Leonard testified that Hutton screamed and cussed at her that day and demanded her respect. She could feel his breath on her face. She further testified that she was frightened after the incident and could not sleep that night. The Trial Court credited Leonard's testimony.

As our High Court has previously explained, "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We have reviewed the security footage, which is very short and audibly indiscernible for the most part. The security footage does not constitute clear and convincing evidence contradicting the Trial Court's credibility determination. Based upon Leonard's testimony, the Trial Court properly considered this an instance of harassment.

The first Facebook post that could reasonably be construed as having been carried out at the workplace is Hutton's June 26, 2023 post, which included a photo of the entrance of the State Street store. The photo included the caption, "At Sonic enjoying a shake wondering where Goodwill's 'security' is at this afternoon." The caption concluded with a laughing emoji. The accompanying Facebook post read:

Here's a thought:

If you spent as much time minding your own business instead of worrying about my every move, and not trying to cover up your corrupt ways, maybe you wouldn't have to waste additional NON-PROFIT money on added "security" in the form of a posted Sheriff's Deputy at your establishment.

---

[4] We, however, make no determination as to whether "at the workplace" could encompass remote work settings on online applications such as Zoom or Microsoft Teams for example. That scenario is not before us in the present case.

- 19 -

I told you, I'm not the one. But I assure you, my actions won't be directed at any individual at the store level. I'm coming after your corrupt, corporate head. Take that back to your corporate lawyer, because I promise you it's a check I WILL cash!

I WILL let the public know how you're soliciting donations for "Veteran's services" yet you treat a Veteran (myself) the way you have over the past 16 months. You CANNOT and WILL NOT silence the truth! You WILL be held liable for your actions! Any questions or inquiries can be directed to me via comment or DM. I'd LOVE to tell #MyStory

Johnson City Press
Kingsport Times-News
Bristol Herald Courier
WCYB
WJHL
Goodwill Industries International

The last post that could reasonably be construed as having been carried out at the workplace was posted on March 25, 2024, and reads: "The (rent-a) cops are out in full force on W State St." The post concluded with a laughing emoji.

As relevant to the statutory definition of stalking, "unconsented contact" includes the respondent's appearance at the petitioner's workplace. Based upon these two posts, Hutton was at the State Street store, despite having been banned, and his appearance at and observance of the store constitutes unconsented contact.

Nevertheless, we are unable to conclude that these two posts would cause a reasonable person to suffer significant mental suffering or distress. The June 26, 2023 post accuses Goodwill and its management of corruption and refers to the Petitioners' "corporate lawyer." As with many of his Facebook posts, Hutton appears to reference and threaten litigation and a media campaign against Goodwill. Although his posts mock Goodwill's security, Hutton appears to be expressing his frustration with Goodwill's decision to ban him from its stores and their perception of him as a physical threat. In the June post, Hutton even clarified that his actions "won't be directed at any individual at the store level." Instead, he stated that he was "coming after your corrupt, corporate head," which in the context of the post appears to be in reference to litigation and a campaign to get media attention for what he perceives as corruption.

Many of Hutton's Facebook posts threatened litigation, criticized Goodwill and its leadership, or attempted to garner media attention. The Trial Court characterized Hutton's posts as "repeated threats of litigation." We are unaware of any law that

- 20 -

prevents individuals from threatening litigation.[5] Although defaming statements may be restricted, defamation was not litigated and that issue is not before us. Hutton's Facebook posts may be distasteful, offensive, or even vitriolic, but they do not rise to the level of unlawful violence, and they would not cause a reasonable person to undergo significant mental suffering or distress.

Given that we have found only one instance of harassment carried out by Hutton in the workplace, we are unable to conclude that Hutton committed unlawful violence in the workplace via stalking, which requires a "pattern of conduct composed of two (2) or more separate, noncontinuous acts evidencing a continuity of purpose." Tenn. Code Ann. § 39-17-315(a)(1)(A). We accordingly reverse the Trial Court's injunction, with the understanding that nothing about this reversal prevents Goodwill from maintaining its ban on Hutton from its premises or calling law enforcement to respond to any criminal trespass by Hutton in the future.

The next issue is whether the Trial Court erred in finding Hutton in contempt for violating its temporary restraining order. "[D]ecisions to hold a person in civil contempt are reviewed using the abuse of discretion standard of review," and "reviewing courts will set aside a discretionary decision only when the court that made the decision applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008).

With respect to contempt, the Trial Court concluded:

Additionally, Petitioners allege that the Respondent committed eleven separate occasions of contempt between April 11 and April 14. Petitioners are requesting that the Court impose a $50 fine per contempt occasion in addition to awarding Petitioners their attorneys' fees incurred in filing the motion.

In the present case the Court, through the Ex-Parte Temporary Restraining Order entered on March 22, 2024, Ordered the Respondent to refrain from "making posts on social media that are threatening, intimidating, harassing, and/or defamatory regarding Goodwill and/or its employees, including but not limited to Morris Baker, Caitlin Wheeler, Melissa Clark, and/or Kimberly Leonard." The Court finds by a preponderance of the evidence that the Ex-Parte Temporary Restraining

---

[5] Petitioners argue on appeal that repeated threats of litigation can be harassing and would cause anxiety in a reasonable person. Although they may cause anxiety, we are unable to conclude they would cause significant mental suffering or distress within the meaning of the TVWA or stalking statute.

Order entered on March 22, 2024, and personally served on the Respondent on April 11, 2024 was a lawful, clear and unambiguous order. The Court further finds that the Respondent violated the Court's Order by his posts on Facebook and that the Respondent's violations were willful. Specifically, the Court finds that the Respondent violated the Court's Order on eleven (11) separate occasions through his posts detailed in the Factual Findings paragraphs (29)(a) through (k). The Court will assess a fine against the Respondent in the amount of $50.00 per violation for a total of $550.00. Respondent shall pay the $550.00 fine into the Registry of the Court within thirty (30) days from entry of this Order.

The Trial Court's March 22, 2024 *ex parte* temporary restraining order prohibited Hutton from contacting Goodwill or its employees; coming within 500 feet of any Goodwill location; coming within 500 feet of Baker and various other named employees; and making threatening, intimidating, harassing, and/or defamatory social media posts about Goodwill or its employees.

We reverse the Trial Court's findings of contempt given that it imposed a criminal contempt punishment for what it determined to be civil contempt and applied the incorrect standard of proof. This Court has previously explained the differences between civil contempt and criminal contempt as follows:

> Contempt may be either criminal or civil. Criminal contempt is used to "preserve the power and vindicate the dignity and authority of the law" as well as to preserve the court "as an organ of society." Generally, sanctions for criminal contempt are designed to punish the contemnor and are unconditional in nature. It is issued as punishment and is unconditional.
>
> Civil contempt, however, occurs when a person refuses or fails to comply with a court order and a contempt action is brought to enforce private rights. Civil contempt sanctions are remedial and coercive in character, designed to compel a party to comply with the court's order. Unlike criminal contempt, the contemnor can purge the contempt by complying with the court's order.

*State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Tr.*, 209 S.W.3d 602, 613 (Tenn. Ct. App. 2006) (internal citations and footnote omitted). In contrast to criminal contempt, the party found to be in civil contempt holds the "'keys to the jail' and can purge the contempt by complying with the court's order." *Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000) (citing Tenn. Code Ann. § 29-9-104 and *Garrett v. Forest Lawn Mem'l Gardens, Inc.*, 588 S.W.2d 309, 315 (Tenn. Ct. App. 1979)). Moreover, whereas the burden of proof for civil contempt is preponderance of the evidence, the standard of proof

for criminal contempt is beyond a reasonable doubt. *Doe v. Bd. of Prof'l Resp. of Sup. Ct. of Tenn.*, 104 S.W.3d 465, 474 (Tenn. 2003).

> With respect to fines for civil contempt, our Supreme Court has explained:
>
> [C]ivil contempt fines . . . are generally regarded as being remedial in nature when (1) the fine is prospectively coercive, or (2) the fine serves to compensate the party injured by the violation of the order. *See, e.g., United Mine Workers v. Bagwell*, 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). Importantly, though, because of its close kinship to the traditional goals of punishment, a prospectively coercive fine possesses a limited ability to serve as a predominantly remedial measure. To this end, the United States Supreme Court has recognized in the civil contempt context that "[w]here a fine is not compensatory, it is civil *only* if the contemnor is afforded an opportunity to purge." *Id.* (citing *Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947)) (emphasis added); *see also Parisi v. Broward County*, 769 So.2d 359, 365 (Fla. 2000). In fact, "[t]he absence of a purge provision means that the fine will be imposed regardless of reform and commitment to obey. A fine without a purge provision therefore suggests an intention to punish past misconduct rather than to insure future lawfulness." *New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 94 (2d Cir.1998).

*City of Chattanooga v. Davis*, 54 S.W.3d 248, 271-72 (Tenn. 2001)

The Trial Court found Hutton in civil contempt, using a preponderance of the evidence standard, but then imposed a criminal contempt punishment. The Trial Court imposed a fine of $50 for every instance of contempt without providing any mechanism for Hutton to purge the contempt by his compliance. Accordingly, the Trial Court's fines were not prospectively coercive. The Trial Court also ordered that the total fine of $550 be paid into the registry of the court, rather than to Petitioners as damages. Based on the language of the Trial Court's judgment, we conclude that the Trial Court's fines constitute an unconditional punishment for Hutton's past actions, rather than a mechanism for future compliance. Hutton did not hold the "keys to the jail." The Trial Court accordingly misapplied the law by punishing Hutton for criminal contempt, while finding him in civil contempt under the preponderance of the evidence standard. Given its abuse of discretion and application of a lower standard of proof, we reverse the Trial Court's contempt findings.

The last issue before us is whether the Trial Court erred by granting Petitioners an award of attorney's fees. The standard of review for this issue is as follows:

> [A] determination of attorney's fees is within the discretion of the trial

court and will be upheld unless the trial court abuses its discretion. We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision. The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court, and we will find an abuse of discretion only if the court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party."

*Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (internal citations omitted).

The Trial Court granted Petitioners an award of attorney's fees in the amount of $3,360, which was incurred in connection with their motion for contempt. Given that we have reversed the Trial Court's findings of contempt, we also reverse the Trial Court's award of attorney's fees for work incurred in litigating the motion for contempt.

The Trial Court also granted Petitioners an award of attorney's fees, pursuant to Tenn. Code Ann. § 36-3-617(a)(1) (West July 1, 2021 to Mar. 24, 2025), which provides in part: "If the court, after the hearing on the petition, issues or extends an order of protection, all court costs, filing fees, litigation taxes and attorney fees shall be assessed against the respondent." The Trial Court awarded Petitioners $34,239 in attorney's fees for "work related to the Tennessee Violence in the Workplace Act because the work necessary to obtain relief under both statutes is closely related, intertwined, and unable to be apportioned from work necessary for the Order of Protection."

The Trial Court considered the work related to the order of protection and the work related to the TVWA inseparable, and instead of dismissing the order of protection for lack of proof, dismissed Baker's order of protection only because the TVWA provided Baker more protection. Given that we reverse the Trial Court's injunction pursuant to the TVWA, we also reverse the Trial Court's award of attorney's fees in the amount of $34,239. We also deny Petitioners' request for attorney's fees on appeal.

## Conclusion

For the foregoing reasons, we reverse the Trial Court's judgment and remand this cause to the Trial Court for collection of costs below. Costs of this appeal are assessed against the appellees, Goodwill Industries of Tenneva Area, Inc., and its CEO, Morris Baker.

_____
D. MICHAEL SWINEY, CHIEF JUDGE